# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

DOROTHY G. MARAGLINO,

                 Petitioner,

v.

J. ESPINOZA, Warden,

                 Respondent.

Case No.:  19cv0109 LAB (KSC)

**ORDER:  (1) DENYING PETITION FOR WRIT OF HABEAS CORPUS;**

**(2) DENYING REQUEST FOR APPOINTMENT OF COUNSEL; and**

**(3) DENYING CERTIFICATE OF APPEALABILITY**

## I.    INTRODUCTION

Dorothy Maraglino ("Maraglino" or "Petitioner"), a state prisoner proceeding pro se, has filed an Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 ("Petition" or "Pet."), challenging her San Diego Superior Court conviction in case number SCN304686 for first degree murder with special circumstance, conspiracy to commit kidnapping and kidnapping.  (*See* Pet. at 1–2, ECF No. 3.)  The Court has reviewed the Petition, the Answer and Memorandum of Points and Authorities in Support of the Answer, the lodgments, the Traverse and all the supporting documents submitted by both parties.  For the reasons discussed below, the Court the Petition is **DENIED**.

/ / /

## II. FACTUAL BACKGROUND

The following statement of facts is taken from the California Court of Appeal opinion, *People v. Maraglino, et al.*,[1] No. D69297, slip op. (Cal. Ct. App. Dec. 29, 2017). This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parke v. Raley*, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from those facts, are entitled to statutory presumption of correctness). The appellate court summarized the facts as follows:

> On April 13, 2012, [Louis] Perez picked up [Brittany] Killgore from her apartment under the pretext of taking her on a dinner cruise. Ten minutes later, Killgore sent her friend a text message saying, "Help." Four days later, detectives recovered her nude body near Lake Skinner in Riverside County. Evidence presented at trial suggested Killgore died while defendants were acting out a BDSM kidnapping fantasy. [Footnote 2: The acronym "BDSM" was used throughout trial to refer to "bondage discipline sadomasochism." As described at trial, the BDSM lifestyle included defined roles of "master" and "slave," graphic fantasy writings, and the infliction (and receiving) of pain during "play" sessions.]
>
> Perez, [Dorothy] Maraglino, and [Jessica] Lopez were active participants in the BDSM lifestyle, respectively occupying roles in their household of "master," "mistress," and "slave." Perez and Maraglino were in a dominant-submissive relationship wherein Perez was the dominant and Maraglino was his submissive. Perez lived in a separate residence but often visited Maraglino at her home in Fallbrook, California. Lopez was Maraglino's slave and lived in Maraglino's home.
>
> As a masochist, Lopez enjoyed receiving pain; Maraglino would inflict pain on her through BDSM "play." Although a slave in the Maraglino household, Lopez had been a dominant in the past and in an ongoing online relationship with someone named Bella. Maraglino was a "switch," meaning she was submissive with Perez and dominant with

---

[1] Maraglino's direct appeal was consolidated with that of her co-defendants, Louis Perez and Jessica Lopez. (*See* Lodgment No. 14 at 21, ECF No. 16-49.)

Lopez. Maraglino established written procedures, including a "House Manual," "Perfect Slave Checklist," and slave contract. She controlled everything Lopez did inside and outside the home; Lopez wore a dog collar stating she was Maraglino's property. As Maraglino's master, Perez had control over Maraglino's household, including control over Lopez.

Perez was a sadist and enjoyed inflicting pain on others. In his past relationship, he choked Jonie L. almost every time they had sex and proposed to have her abducted by strangers. He also restrained Jonie L. during sex and dragged a heavy chain and knife across her body. There were times Jonie L. did not want Perez to engage in certain acts but did not feel that using her safe word would be effective. In a different relationship, Perez choked Angela .M. about 25 to 30 percent of the time during sex, either with his hands or with a belt. He told Angelena M. about kidnapping scenarios he had tried with others. One involved a group of men driving around and taking turns having intercourse with a female in the van; Perez asked Angelena M. to act as that female. Although there was testimony Perez was considered a "safe" player in the BDSM community who acted only with consent, detectives found a video of Perez beating a woman with various implements as she begged him to stop and continuing to beat her past the point of consciousness.

All three defendants had BDSM abduction, torture, and murder fantasies. Lopez's diary contained a ciphered writing in which she abducted, tortured, and killed someone she disliked, disposing of the body and dousing evidence with bleach. Maraglino authored a writing about abducting three generations of women, each one "prescribed a method of death" and subjected to sexual torture, torture, and forced suicide. Maraglino authored a separate writing, found in Perez's garage, in which she slit the throat of a woman while that woman was having sex with Perez. Maraglino made a handwritten list of "hunting ground[s]" for vulnerable victims that included ways to dispose of a body and avoid detection. Perez and Maraglino discussed their abduction fantasies with Dora B., another of Maraglino's slaves, on two or three occasions. At one point, Maraglino asked Dora how she would react if a kidnapped woman were brought to the home. Dora worried these fantasies "didn't always take consent into account," but she "wanted to believe that it was nothing more than a fantasy."

Perez and Maraglino acted out an abduction fantasy on Nicole A. Without prior agreement, Perez and Maraglino picked up Nicole in a

parking lot, blindfolded her, undressed her in the "dungeon" in the basement of Maraglino's home, restrained her, and engaged in BDSM play. Thereafter, Nicole voluntarily joined the household for a short period as Maraglino's slave.

Perez and Maraglino had an open relationship, but Maraglino was paranoid about losing him to another woman. Nicole's relationship with Maraglino soured because Nicole communicated with Perez directly, rather than go through her. As their relationship deteriorated, Maraglino made threatening statements toward Nicole's daughter. When Perez began seeing Marina V., Maraglino talked about killing Marina and wanting her to die a torturous death; in an online forum, she threatened to kill Marina and Marina's daughter. Perez and Maraglino briefly broke up over Marina; they soon rekindled their relationship and in 2011 conceived a child.

Although there was some evidence the relationship between Perez and Maraglino became more conventional after they reunited, there was also evidence they remained involved in BDSM. Lopez remained Maraglino's slave. Maraglino kept her BDSM toys and, on the day of Killgore's disappearance on April 13, 2012, sent Deborah E. a text message about a forced lactation-torture fantasy. [Footnote 3 omitted.] On the day before Killgore's disappearance, Perez texted Alda E. about upcoming plans to engage in BDSM play with someone he did not like, which to Alda E. was a "very big red flag." Alda E. told Perez not to go through with it, but he said it would give him "control to temper my feelings and not hurt [] someone I want to hurt badly."

Killgore's close friend, Elizabeth Hernandez, became friends with Maraglino in 2011. Hernandez would often visit Maraglino's home and bring Killgore with her. Killgore and Hernandez were not involved in BDSM, but both knew that defendants were. Although Maraglino was initially friendly with Killgore, she became hostile toward her after she perceived Killgore flirting with Perez. Maraglino called Killgore "the disease" and "the herpes" when she was not around; asked why Hernandez and Killgore were always together; and seemingly in jest, offered to get rid of Killgore for Hernandez. There was some evidence Maraglino wanted to recruit Hernandez into the BDSM lifestyle because Hernandez seemed impressionable and easy to control. On April 13, 2012, the day of Killgore's disappearance, Maraglino wrote a letter stating:

///

"I Dee [Maraglino] do hereby give to Ivan [Perez] all my grudges and revenge from my birth till [sic] now. I release my anger and entrust justice into Ivan's hands. I accept Ivan will decide, design, and dispense the measure of retribution he deems appropriate to my enemies, tormenters, and violators."

Lopez appeared to have a better relationship with Killgore, but she, like Maraglino, called Killgore "the disease" and "herpes" and joked, on April 13, 2012, that she would make Killgore walk the plank at her pool party the next day.

On the afternoon of April 13, 2012, Hernandez visited Maraglino's home to return a camera charger. She stayed to socialize with Maraglino and Perez; Lopez was not home. Maraglino seemed excited to hear Killgore was going to move to the east coast, saying Hernandez would finally be "free." Hernandez told Perez and Maraglino about her recent excursion on the Hornblower dinner cruise in San Diego. She said Killgore seemed very interested in going, and she wanted to take Killgore on a cruise before she moved. Hernandez recalled nothing out of the ordinary about her conversation. Perez and Maraglino did not mention having tickets or plans to go on a dinner cruise that evening.

Killgore and Hernandez lived in the same apartment complex on Ammunition Road in Fallbrook, as did friends Channy Tal [footnote 4 omitted] and Jessica Perry. At 4:38 p.m. [footnote 5: All times are p.m., unless otherwise noted.] on April 13, 2012, Perez knocked on Killgore's door. Tal was in the apartment, helping Killgore pack for her upcoming move. Killgore asked Perez how he knew where she lived; Perez replied that he had "asked around." Perez pressed Killgore to come with him on the Hornblower dinner cruise that night, saying he had two tickets but nobody to go with. Killgore declined. Perez gave Killgore his phone number, and security footage showed him leaving the complex at 4:54. When leaving the apartment, Perez texted Maraglino, "That guy wasn't successful," to which Maraglino replied, "Tomorrow is another day."

A few minutes after Perez left, Killgore texted to ask if he knew anyone who could help move her belongings. At 5:00, Perez texted Killgore, "Party with me tonight & you'll have five guys there in the morning." Killgore replied that she would welcome help moving but felt "weird about the partying" because she did not think Maraglino would like it.

Killgore told Tal she was uncomfortable accompanying Perez because he was in a relationship with Maraglino.  Perez responded to Killgore's text, saying Maraglino was "ok with it" and suggesting at 5:19 that Killgore text her to confirm.  Killgore replied at 5:26 that she did not know Maraglino's number and did not think Maraglino liked her.  Perez reassured Killgore that was not the case and gave her Maraglino's number.  At 5:39, Perez checked in to see if Killgore had contacted Maraglino.  Killgore replied two minutes later that she had not but would.  At 5:42, Maraglino searched the Internet on her phone for "San Diego dinner cruise."  A minute later, Perez texted Killgore to say he was "dressing up to go to dinner on the hornblower."

Killgore called Maraglino and left a voicemail message at 5:55.  Maraglino called back ten minutes later, and Tal overheard their conversation.  Maraglino seemed friendly and was laughing; she told Killgore to go with Perez on the cruise because she was pregnant and would get seasick.  After speaking with Maraglino, Killgore decided to go.  She told Tal she had no interest in Perez, but thought it would be her last chance to go on the dinner cruise before she moved to Pennsylvania the following week.

Killgore texted Perez around 6:10 agreeing to go, asking what time he would pick her up and when his friends would help her move.  At 6:12, Maraglino searched the Internet on her cell phone for "Hornblower San Diego."  Perez sent Killgore texts at 6:15 and 6:19 asking her to be ready at 7:30 that night and stating his friends would help her move in the morning.  At trial, the parties stipulated that on April 13, 2012, the Hornblower cruise left the dock in San Diego at 7:00, meaning it would not have been possible to make it if they left Fallbrook at 7:30, and that Maraglino, Perez, and Killgore did not have tickets for the cruise.

Killgore left Tal phone numbers for Perez and Maraglino, saying she still felt unsure about going.  She borrowed two dresses from Tal and got ready to leave.  At 6:38, Killgore texted Hernandez that Perez had stopped by to ask her out and it was "odd."  Hernandez followed up, and Killgore texted her at 7:30 that Perez was taking her "[t]o the [H]ornblower and a casino" after Maraglino had given permission. Hernandez testified that this plan confused her because Perez and Killgore hardly interacted.

At 7:31, Perez sent Killgore a text message saying, "I'm running late be there in five minutes, can you meet me at the curb?  I got stopped at the

front gate." [Footnote 6: At trial, Perez admitted he knew there were surveillance cameras in Killgore's apartment complex, supporting an inference that he tried to park outside their view when picking Killgore up.] Killgore responded, "At the curb? It's raining you know. Id [sic] appreciate it if you drove into the complex." Perez responded, "It's not. I don't want to miss our boat." Perez called Killgore and evidently agreed to drive up to her complex. Surveillance footage showed Perez entering the complex at 7:36. At 7:37, Perez texted Killgore, "I'm here," and Killgore responded, "I'm out now." At 7:39, Killgore texted Perry that she was going with Perez on a dinner cruise and might stop by to visit Perry afterwards. Surveillance footage showed someone getting into the passenger side of Perez's car; the car pulled out of the lot around 7:40. Perez testified that he then drove Killgore to Maraglino's home to pick up a flier, and a neighbor recalled Perez's car swerving up to Maraglino's residence near dusk.

At 7:50, ten minutes after leaving her apartment complex with Perez, Killgore sent Tal a text message that read, "Help." Killgore's cell phone was closer to Maraglino's house than to her apartment when she sent that text. At 7:57, Perez texted Maraglino, "Kitten?" At that point, Maraglino and Lopez were shopping at a grocery store located just minutes away from Killgore's apartment and about 5 to 15 minutes from Maraglino's home (depending on traffic). Around 7:58, Lopez left the store to retrieve her wallet from Maraglino's home while Maraglino waited at the checkout aisle.

Around 8:00, Tal tried three times to contact Killgore. At 8:05, she received a text from Killgore's phone stating, "Yes I love this party." Tal was suspicious because the message did not resemble Killgore's texts. She demanded Killgore call her so she could hear her voice. Tal received another suspicious text message from Killgore's phone at 8:07 that said, "In a few hot guys." Tal insisted Killgore call her immediately, and Killgore's phone made two short calls to Tal at 8:09 and 8:10. Tal texted Killgore that she could not hear her when she called, and Killgore's phone sent Tal a message stating, "Its ok music is too loud." At trial, Perez admitted using Killgore's phone to call her friends while playing loud background music from his car.

/ / /

/ / /

Meanwhile, Maraglino, who remained at the grocery checkout aisle, left missed calls on Lopez's phone at 8:07 and 8:09. At 8:10, Maraglino stepped outside and returned a few seconds later with Lopez. At 8:11, Perez texted Maraglino, "Come home," suggesting he was then at Maraglino's home. At 8:12, Lopez and Maraglino were seen on video leaving the grocery store.

Killgore's friends grew very concerned. At 8:14, Hernandez called Killgore; cell location data placed Killgore's phone near Maraglino's house at that time. At 8:21, Hernandez called Maraglino, who lied that she had not spoken to Killgore that day. At 8:30, Tal texted Killgore, demanding she call her. At 8:40, Perry called Perez, who told her he had left Killgore downtown at a club. Perez told Perry he had last seen Killgore talking to some guys outside the club. He kept repeating that Killgore's face looked okay, which struck Perry as odd. Cell location data indicated Perez and Lopez were both in the vicinity of Maraglino's home in Fallbrook up to this point.

Maraglino, who previously worked for a cell phone company, told Perez that cell phones were traceable. Perez then decided to dispose of Killgore's phone in downtown San Diego to corroborate the story he had told Perry. At 9:20, cell location data showed Perez driving southbound from Fallbrook toward San Diego. Perez had Killgore's phone with him. While driving south on the I-15, Perez texted Killgore "Where are you?" and "You're friends are calling me worried." He texted Maraglino asking about her night, and Maraglino replied that she was having a quiet night at home. Perez later admitted to using Killgore's phone to send text messages to her friends. At 10:10, Tal tried again to call Killgore and texted, "Should I just call the cops." Killgore's phone responded from a downtown San Diego location, "Im ok." Perez's license plate was photographed downtown by a San Diego Police Department license reader at 10:34. Perez's phone and Killgore's phone remained downtown until 10:51, when Perry tried again to reach Killgore.

At 11:02, Perez called Perry as he was driving north from San Diego toward Fallbrook. Perez sounded frantic and told Perry he had been driving around looking for Killgore. Perez returned to Maraglino's home after midnight. Thereafter, cell data showed Perez's and Lopez's cell phones moving east toward Temecula. In the early hours of April 14, both Perez's and Lopez's cell phones were traced near Lake Skinner and later traced returning toward Maraglino's home. At trial, Perez explained that

he and Lopez wrapped Killgore's corpse in a tarp and put it in a trailer that they hitched to Perez's car. Perez drove the trailer to Lake Skinner, with Lopez tailing his car to cover the trailer's missing license plate, and the two dumped the body near Lake Skinner.

On the morning of April 14, Hernandez confronted Maraglino, saying she knew Maraglino had spoken to Killgore the previous day. Maraglino stuttered and gave the phone to Perez. During the call, Perez changed his story two or three times as to what had happened the previous night.

Tal and Hernandez went to search for Killgore in her apartment; when they did not find her, they called the sheriff's department. Perez called Hernandez around noon and offered to drive her around to look for Killgore; Hernandez told him law enforcement had already arrived. Sheriff's Deputy James Breneman called Perez, who sounded panicked but offered to come talk in person.

Perez drove to Killgore's apartment complex on the afternoon of April 14. After he parked, surveillance footage showed him doing something inside his right rear passenger door. Perez told detectives Killgore was flirty, flighty, and that she had been drinking; Killgore's friends did not agree with these characterizations. Perez claimed he had left Killgore downtown at a club the night before and that Killgore had texted him, "I'm okay." Deputy Breneman was suspicious when he did not find that text on Perez's phone. He also found it strange that Perez's car was caked with fresh mud, given the heavy rains the night before. Perez agreed to provide a voluntary statement at the sheriff's department and was transported there. He consented to a search of his vehicle and was placed under arrest when deputies found an unlawful weapon inside. Later that afternoon, someone turned in Killgore's phone in downtown San Diego.

Deputies searched Maraglino's home on April 15 and 16. On April 16, Lopez and Maraglino were gone, and some items seen the previous day were missing, as if someone cleaned up. The sheriff's department authorized a search for Maraglino's truck, which bore the license plate, "Ivnsktn" ("Ivan's Kitten," indicating Maraglino was Perez's "Kitten"). Deputies found the truck on April 17 at a hotel parking lot near the San Diego airport. They forcibly opened a room booked under Maraglino's name and found Lopez, bleeding at the neck and half naked after an apparent suicide attempt. In the room were three copies of a seven-page

handwritten confession letter by Lopez, with a sign above stating, "Pigs read this."

In the letter, Lopez used derogatory language, describing Killgore as a "miserable cunt" who had tried to come between Perez and Maraglino. Lopez took complete responsibility for Killgore's death, saying sheriffs had arrested the "WRONG FUCKING PERSON" in Perez. Lopez claimed she alone had grabbed Killgore; slammed her body into the stairs; restrained her wrists, ankles, and mouth; subdued her with a Taser; wrapped rope around her neck to apply and release pressure; attempted to hack up the body with power tools; doused the body with bleach; and dumped the body near Lake Skinner. The letter described injuries that would likely be found on Killgore's body – ligature marks around her neck and wrists, a Taser mark near her neck, and bruising and mutilation marks. [Footnote 7: The letter also contained statements that did not correspond with other evidence, including that the murder happened after 11:15 and that Killgore, who did not drive, appeared suddenly at the residence to demand sex with Perez.] Lopez expressed her love to Maraglino as her slave and pet; sheriffs found a dog collar in the room marking Lopez (alias Rosalin) as "Property of Ms. Dee [Maraglino]." There were three copies of the confession letter in the hotel room, one addressed to "Master Ivan" (Perez), another to "My parents," and a third to a local media station. Surveillance video showed the hotel receptionist making copies of the letter for Lopez the previous night. Maraglino was in the hotel when Lopez had her letter copied and departed San Diego on the morning of April 17 to visit family in Virginia. Deputies accompanied Lopez to the hospital, and she was arrested thereafter.

Based on Lopez's letter, deputies focused their search team on the Lake Skinner area in Riverside County. Later that afternoon on April 17, deputies found Killgore's nude body about a mile from Lake Skinner. The medical examiner determined the cause of death to be ligature strangulation, with hemorrhaging in her eyes consistent with pressure being intermittently applied and released over a long period. The cricoid cartilage of Killgore's neck had been fractured, indicating someone had applied more than 33 pounds of pressure on her neck. There were bruises on her legs, a bruise outside her left wrist consistent with the use of handcuffs, two cuts forming a "T" on her left wrist, and five small pinprick marks on the left side of her face, consistent with the use of a stun baton. In addition, there was a deep postmortem cut to Killgore's left knee with marks consistent with the use of a power saw. The lack of maggots was

consistent with the wound having been doused with bleach. There were postmortem abrasions on Killgore's back, consistent with the body being rolled down the embankment. There were no internal or external injuries to Killgore's genitalia.

As lead sheriff's detective Brian Patterson was driving to Lake Skinner on April 17, Maraglino called him to say that she and Lopez ordered a movie on cable on April 13 called "Adventures of Rin Tin" and had spent the night in. Her cable records later indicated she rented "Tintin" on April 14 and did not rent any movies on the 13th. Maraglino hung up after Patterson pressed her on inconsistencies with Perez's account, insisting that he could not get her to contradict Perez.

Officers searched Maraglino's home again on April 19. They recovered the roll of plastic mentioned in Lopez's letter and photographed a reciprocating saw blade in a drawer near the hallway. They also recovered various images, videos, documents, and BDSM implements from the home. [Footnote 8: Among these was the "Deed to Dee" and "Perfect Slave" documents, found in the room Maraglino was setting up as a nursery. At trial, Maraglino's counsel presented evidence that the "Deed to Dee" document was found in a broken glass frame at the bottom of a closet to show that Perez and Maraglino had ceased participating in BDSM by April 2012.] Officers recovered a release of liability form in which Maraglino stated she voluntarily engaged with Perez in BDSM activities, including whipping, beating, and asphyxia, and that she relieved Perez of "injuries or loss of life that may result." They also recovered the April 13, 2012 writing in which Maraglino released her anger to Perez and entrusted him to deliver justice and retribution. Maraglino was arrested in May 2012.

A later search of Perez's vehicle revealed a plastic bag containing food wrappers, disposable gloves, a piece of plastic, and a stun baton in working condition. There was blood on the plastic gloves, pieces of plastic, and the plastic bag matching Killgore's DNA. Swabs from the piece of plastic and the gloves matched Perez's DNA. The stun baton contained Perez's DNA on the straps and handle and Killgore's DNA on the prongs. There was no semen found in Perez's car. Tire treads from Perez's car were a possible match to the treads found near Killgore's body at Lake Skinner.

///

Sheriff's deputies ultimately found no evidence of blood or semen at Maraglino's home. They recovered a rope and knife from Maraglino's truck but could not connect those items to Killgore's murder. They also recovered from Maraglino's truck a receipt for cleaning products, water, paper towels, and rubber gloves purchased on April 14.

A special agent with the Naval Criminal Investigative Service searched Perez's home on base and found additional BDSM writings, including Maraglino's throat-slit fantasy writing. Maraglino's cell phone was found a year and a half later, cleared of text data, disassembled, and underneath several suitcases in a closet in her brother's house in Missouri. The clothes worn by Maraglino, Perez, and Killgore on April 13 were never recovered.

At trial, Perez admitted he had lied to Perry and detectives about taking Killgore downtown, and he admitted taking Killgore's cell phone downtown to match that story. He claimed he had lied to protect Maraglino but denied doing so to give her more time to clean up. Perez admitted he had misled Killgore into believing they were going on a cruise long after they had already missed it in order to get her into his car. He also admitted telling Becky Z. on October 17, 2013, "everybody had a role to play that night, including myself." On redirect, Perez explained this statement referred only to his role in the cover-up and that he had also told Becky, "I didn't kill anybody."

(Lodgment No. 14 at 3–21, ECF No. 16-49.)

## III. PROCEDURAL BACKGROUND

On May 10, 2013, the San Diego District Attorney's Office filed an amended information charging Maraglino with murder (Cal. Penal Code § 187) (count one), with a kidnapping special circumstance (Cal. Penal Code § 190.2(a)(17)); conspiracy to commit kidnapping (Cal. Penal Code § 182 (a)(1)) (count two); kidnapping (Cal. Penal Code § 207(a)) (count three); torture (Cal. Penal Code § 206) (count four); and attempted sexual battery by restraint (Cal. Penal Code §§ 664, 243.4(a)) (count five). (Lodgment No. 3, Clerk's Tr. vol. 1 at 12–19, ECF No. 16-34.)

Maraglino was tried by jury, along with her co-defendants Perez and Lopez. The jury was sworn on September 9, 2015. (Lodgment No. 3, vol. 6 at 1524, ECF No. 16-

38.) Deliberations began on October 16 (*id.* at 1593) and verdicts were returned on October 21, 2015. (*Id.* at 1599.) The jury found Maraglino guilty on all five counts and found the special circumstance to be true.[2] (*Id.* at 1598.) On November 19, 2015, the trial court sentenced Maraglino to life without the possibility of parole plus a term of life with the possibility of parole, plus eight years and six months.[3] (Lodgment No. 3, vol. 5 at 1419–22, ECF No. 16-37; *id.*, vol. 6 at 1601.)

Maraglino appealed her conviction to the California Court of Appeal. (*See* Lodgment No. 6, ECF No. 16-41.) On December 29, 2017, the appellate court affirmed Maraglino's convictions in part and reversed them in part. (*See* Lodgment No. 14, ECF No. 16-49.) The court reversed Maraglino's convictions for torture and attempted sexual battery by restraint, concluding that there was insufficient evidence to support them. (*Id.* at 113.) The appellate court affirmed her convictions for first degree felony murder with special circumstance, kidnapping and conspiracy to commit kidnapping. (*Id.*) The court ordered the abstract of judgment against Maraglino be amended to reflect a new sentence of eight years plus life without the possibility of parole. (*See id.*)

Maraglino filed a petition for review in the California Supreme Court, along with Perez and Lopez. (*See* Lodgment Nos. 15, 16, 17, ECF Nos. 16-50–16-52.) The petitions were consolidated and denied without comment or citation on April 11, 2018. (*See* Lodgment No. 18, ECF No. 16-53.)

---

[2] The jury found Perez guilty on all five counts and the special circumstance allegation. (Lodgment No. 3, vol. 6 at 1608–12.) Lopez was acquitted of conspiracy to commit kidnapping and found guilty on the four remaining counts and the special circumstance allegation. (Lodgment No. 4, Supp. Clerk's Tr. at 32–36, ECF No. 16-39.)

[3] The trial court sentenced Maraglino to life without parole on the murder with special circumstance conviction (count one), plus eight years for conspiracy to commit kidnapping (count two), plus an indeterminate life sentence for torture (count four) and six months for attempted sexual battery (count five). The court stayed the sentence for kidnapping (count three) pursuant to California Penal Code section 654. (Lodgment No. 3, vol. 6 at 1601–02.)

On February 12, 2019, Maraglino, proceeding pro se, filed the instant Amended Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 in this Court. (*See* Pet., ECF No. 3.) Respondent filed an Answer and Memorandum in Support of Answer on July 22, 2019. (ECF No. 15.) Maraglino filed a Traverse on July 29, 2019. (ECF No. 17.)

## IV. SCOPE OF REVIEW

Maraglino's Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Lindh v. Murphy*, 521 U.S. 320 (1997). Under AEDPA, a habeas petition will not be granted unless the adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002).

A federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004). In order to grant relief under § 2254(d)(2), a federal court "must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record." *See Taylor v. Maddox*, 366 F.3d 992, 1001 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable

application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003). "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams v. Taylor*, 529 U.S. 362, 411 (2000). "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805–06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75–76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court need not cite Supreme Court precedent when resolving a habeas corpus claim. *See Early*, 537 U.S. at 8. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not be "contrary to" clearly established federal law. *Id.* Clearly established federal law, for purposes of § 2254(d), means "the governing principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Andrade*, 538 U.S. at 72.

/ / /

/ / /

# V.    DISCUSSION

Maraglino lists two claims in her Petition.  In ground one Maraglino contends she was denied due process when the California Supreme Court failed to overturn her "remaining" convictions based on insufficient evidence.[4]  (*See* Pet. at 6.)  In ground two she claims she was denied due process because there was insufficient evidence to support the jury's true finding that she was a "major participant" in the underlying felony that led to the Killgore's death.  (*Id.* at 7, 15–16.)   She argues further in ground two that her sentence to life without the possibility of parole violates the Eight Amendment because the evidence was insufficient to support the special circumstance true finding.  (*See id.*)

## A.    <u>Ground One:  Sufficiency of Evidence</u>

In ground one Petitioner argues her due process rights were violated because there was insufficient evidence to support her "remaining three" convictions.  (Pet. at 13.) While the bulk of her argument focuses on her conviction for conspiracy to commit kidnapping (count two), Maraglino also argues, as she did on direct appeal, there was insufficient evidence to support her convictions for kidnapping (count three) and first degree felony murder (count one).  (*See id.* at 13–15, 18.)   Although these subclaims are less artfully presented, this Court must construe pro se habeas filings liberally and as such, will address them in turn.  *See Maleng v. Cook*, 490 U.S. 488, (1989); *see also Allen v. Calderon*, 408 F.3d 1150, 1153 (9th Cir. 2005).

### 1.    *Clearly Established Law*

It is clearly established that due process clause is violated "if it is found that upon the evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S. 307, 324 (1979); *see also Cavazos v. Smith*, 565 U.S. 1, 7 (2011) (per curiam); *Juan H. v. Allen*, 408 F.3d 1262,

---

[4] As discussed above, Maraglino's convictions for torture and attempted sexual battery were reversed on direct appeal because of insufficient evidence. (*See* Lodgment No. 14 at 113.)

1275 (9th Cir. 2005). This Court must review the state court record and view the evidence in the "light most favorable to the prosecution and all reasonable inferences that may be drawn from this evidence." *Juan H.*, 408 F.3d at 1276 (citing *Jackson*, 443 U.S. at 319).

A petitioner faces a "heavy burden" when seeking habeas relief by challenging the sufficiency of evidence used to obtain a state conviction on federal due process grounds. *Juan H.*, 408 F.3d at 1274. The federal habeas court must "apply the standards of *Jackson* with an additional layer of deference" under Section 2254(d)(1). *Id.*; *see also Coleman v. Johnson*, 566 U.S. 650, 651 (2012) ("We have made clear that *Jackson* claims face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference."). This doubly deferential standard limits the federal habeas court's inquiry to whether the state court's rejection of a sufficiency of the evidence challenge was an objectively unreasonable application of *Jackson*. *Emery v. Clark*, 643 F.3d 1210, 1214 (9th Cir. 2011); *see also Coleman*, 566 U.S. at 651.

In evaluating a sufficiency of the evidence claim on federal habeas, courts must look to the applicable state law defining the substantive elements of the crime. *Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir. 2004) (en banc) (stating the *Jackson* standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law."); *see also Juan H.*, 408 F.3d at 1278 n.14 (citation omitted) (stating that federal habeas courts "look to [state] law only to establish the elements of [the crime] and then turn[s] to the federal question of whether the [state court] was objectively unreasonable in concluding that sufficient evidence supported [the conviction])." In determining whether the evidence was sufficient, this Court must follow the California courts' interpretation of its own state law. *See Bradshaw*, 546 U.S. at 76; *Emery*, 643 F.3d at 1214. However, the "the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." *Coleman*, 566 U.S. at 655.

///

The *Jackson* standard requires a reviewing court "respect the province of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences from proven facts by assuming that the jury resolved all conflicts in a manner that supports the verdict." *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995). "[C]ircumstantial evidence can be used to prove any fact, including facts from which another fact is to be inferred, and is not to be distinguished from testimonial evidence insofar as the jury's fact-finding function is concerned." *See United States v. Stauffer*, 922 F.2d 508, 514 (9th Cir. 1990). Mere suspicion or speculation, however, cannot be the basis for creation of logical inferences. *See Walters*, 45 F.3d at 1358.

### 2. *Conspiracy to Commit Kidnapping*

Maralingo claims her conspiracy to commit kidnapping conviction was based on insufficient evidence, in violation of her due process rights. (Pet. at 6, 13-15.) Specifically, she contends she did not she did not conspire, or intend to conspire, with Perez to lure Killgore into accepting a date him under false pretenses in order to facilitate her abduction. (*See id.*) Respondent argues the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established law. (*See* Mem. P. & A. Supp. Answer at 14–23, ECF No. 15-1.)

### a. State Court Opinion

Petitioner raised this claim in her petition for review to the California Supreme Court. (*See* Lodgment No. 16, ECF No. 16-51.) The court denied the petition without comment or citation. (Lodgment No. 18, ECF No. 16-53.) As such, this Court looks through to the last reasoned state court opinion, that of the California Court of Appeal. *See Ylst*, 501 U.S. at 805–06. The appellate court denied the claim, stating in relevant part:

> Perez and Maraglino were convicted of conspiracy to kidnap, in violation of section 182. "Section 182 prohibits a conspiracy by two or more people to 'commit any crime.' (§ 182, subd. (a)(1).)" (*People v. Johnson* (2013) 57 Cal.4th 250, 257 (*Johnson*).) "'Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act.'

[Citations.] Conspiracy separately punishes not the completed crime, or even its attempt. The crime of conspiracy punishes the agreement itself and 'does not require the commission of the substantive offense that is the object of the conspiracy.'" (*Id*. at p. 258.) "'Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes.'" (*Id*. at pp. 258–259.) "The gist of the crime of conspiracy . . . is the agreement or confederation of the conspirators to commit one or more unlawful acts . . . ." (*Braverman v. United States* (1942) 317 U.S. 49, 53.)

"[A]n agreement to commit a crime, by itself, does not complete the crime of conspiracy." (*Johnson*, supra, 57 Cal.4th at p. 259; see § 184.) There must be proof of an overt act, for "'"evil thoughts alone cannot constitute a criminal offense."'" (*Johnson*, supra, at p. 259.) Once a conspirator has performed an overt act in furtherance of the agreement, the agreement itself becomes punishable. (*Ibid*.) Thus, "a conspiracy requires an intentional agreement to commit the offense, a specific intent that one or more conspirators will commit the elements of that offense, and an overt act in furtherance of the conspiracy." (*Id*. at p. 266; see CALCRIM No. 415.)

Perez and Maraglino do not challenge the sufficiency of the evidence supporting a finding that one of them committed one of the enumerated overt acts in the amended information. Instead, their argument centers around whether there was sufficient evidence to show an agreement and the requisite intent to kidnap. [Footnote 25 omitted.] Perez claims there was sufficient evidence he and Maraglino tried to get Killgore to go out with him on a date but insufficient evidence they agreed or intended to kidnap Killgore. For example, Perez argues Maraglino's Internet searches for "dinner cruise" and "Hornblower San Diego" merely indicated their interest in Perez taking Killgore on a cruise.

Maraglino likewise tries to recast the evidence in her favor. She focuses on the lack of DNA evidence recovered from her home and suggests as one possibility that Perez killed Killgore in his car. Alternatively, she suggests Perez may have taken Killgore to Maraglino's home and killed her there while Maraglino was still at the grocery store. Maraglino claims her Internet searches for "dinner cruise" and her text to Perez that "Tomorrow is another day" did not demonstrate the formation of a conspiracy. She further argues her fantasy writing about the torture and murder of three generations of women is not sufficiently similar to the facts surrounding Killgore's death to support an inference of intent.

These points go to the weight of the evidence, not the sufficiency. (*Brown*, supra, 59 Cal.4th at p. 104.) The jury's verdict "'"may not reversed simply because the circumstances might also be reconciled with a contrary finding."'" (*Id.* at p. 106.) As the People argue, the appropriate question is whether, when interpreted in the light most favorable to the jury's verdicts, there was sufficient evidence from which the jury could reasonably convict Maraglino and Perez of the relevant offenses. We may reverse for insufficient evidence only when there is "'"no hypothesis whatever"'" to support the jury's verdict. (*People v. Bolin* (1998) 18 Cal.4th 297, 331.)

Applying that standard, there was ample evidence from which the jury could find Maraglino and Perez guilty of a conspiracy to kidnap. Contrary to their contentions, there was sufficient evidence of both an intent and agreement to kidnap Killgore.

As to intent, as we have already discussed in relation to the kidnapping charge, there was substantial evidence of an intent to kidnap based on defendants' sexual interests and dislike of Killgore. Our earlier analysis applies with equal force here.

There was also sufficient evidence of an agreement between Perez and Maraglino to kidnap Killgore. An agreement to commit an unlawful act (here, kidnapping) need not be express. (*Johnson*, supra, 57 Cal.4th at p. 264 ["'"To prove an agreement, it is not necessary to establish the parties met and expressly agreed; rather, "a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design."'"].) There is ample circumstantial evidence Maraglino and Perez came to a mutual understanding to accomplish the kidnapping.

On the afternoon of April 13, Hernandez stopped by and told Perez and Maraglino she wanted to take Killgore on the Hornblower cruise. The conversation seemed routine; there was no discussion of Maraglino or Perez having tickets or Perez wanting to help Killgore move her belongings. Hernandez was confused when she later got a text from Killgore saying Perez wanted to take her out, as Killgore and Perez rarely interacted.

After Hernandez left, Perez showed up unannounced at Killgore's apartment and tried to convince her to go on a dinner cruise that night, claiming he had tickets that would go to waste. Killgore was surprised and asked how he knew where she lived. She declined to accompany him, and

Perez texted Maraglino, "That guy wasn't successful." Maraglino replied, "Tomorrow is another day."

Killgore texted Perez shortly thereafter asking for moving help. Perez again pressed her to accompany him. Killgore said she was hesitant because Maraglino did not seem to like her; she said she would "need [Maraglino] to say it was ok" to go. Perez assured her Maraglino bore no ill will and told her to text Maraglino. About twenty minutes later, Killgore had yet to commit, and Perez asked whether she had spoken to Maraglino. While Perez was trying to convince Killgore to go, Maraglino searched for "dinner cruise" and "Hornblower San Diego."

Killgore and Maraglino finally spoke at 6:05; Tal overheard their conversation. Killgore asked for permission to go on the dinner cruise. Maraglino was laughing and joking on the other line; she said it was fine because she was pregnant and would get seasick and encouraged Killgore to go so her ticket did not go to waste. Killgore then texted Perez, "Ok I talked to [Maraglino] and she was good with it so i[']ll go." Perez told Killgore he would pick her up "by 7:30." At trial, the parties stipulated that the Hornblower cruise was from 7 to 10 p.m. on April 13 and that Perez, Maraglino, Lopez, and Killgore were not listed among the ticketholders.

The jury could reasonably infer Maraglino knew from her Internet searches that Perez and Killgore would miss the cruise. Perez admitted knowing when texting Killgore at 7:32 that he did not "wanna miss our boat" that they could not make it. Neither conveyed this information to Killgore, who texted her friend at 7:39 to say she was going on a cruise. Maraglino and Perez together convinced Killgore to accompany Perez on a dinner cruise they knew they would not make. The jury could reasonably infer they agreed to kidnap Killgore.

Therefore, viewing the evidence in the light most favorable to the verdict, there is sufficient evidence from which the jury could find Maraglino and Perez both intended and agreed to kidnap Killgore. Substantial evidence supports their conspiracy convictions.

(Lodgment No. 14 at 49–53.)

### b. Discussion

The state court's conclusion that there was sufficient evidence to support Maraglino's conviction for conspiracy to commit kidnapping was neither contrary to, nor

an unreasonable application of, clearly established law. As the appellate court stated, conspiracy requires "two or more persons agreeing to commit a crime, along with the commission of an overt act, by at least one of these parties, in furtherance of the conspiracy." *People v. Dalton*, 7 Cal. 5th 166, 244 (2019) (quoting *People v. Homick*, 55 Cal. 4th 816, 870 (2012)); *People v. Morante*, 20 Cal. 4th 403, 416 (1999); *see also* Cal. Penal Code § 182(a)(1).

Specifically, the jury was instructed on the elements of conspiracy to kidnap as follows:

> To prove that a defendant is guilty of this crime, the People must prove that:
>
> 1. The defendant intended to agree and did agree with one or more of the other defendants to commit the crime of kidnapping;
>
> 2. At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would commit the crime of kidnapping;
>
> 3. One or some of the defendants committed at least one of the following alleged overt acts to accomplish the crime of kidnapping . . . .

(Lodgment No. 3, vol. 4 at 1175, ECF No. 16-36; *see also* CALCRIM No. 415.) The jury instruction went on to enumerate 42 alleged "overt acts," over a dozen of which specifically related acts purportedly done by Maraglino. (*See* Lodgment No. 3, vol. 4 at 1175–81.) Kidnapping is defined as unlawfully moving the victim "by use of physical force or fear, without the person's consent, and the movement was for a substantial distance." *People v. Williams*, 7 Cal. App. 5th 644, 670 (Cal. Ct. App. 2017); *People v. Bell*, 179 Cal. App. 4th 428, 435 (Cal. Ct. App. 2009); *see also* Cal. Penal Code § 207(a).

Starting with the third conspiracy element, Petitioner does not dispute there was sufficient evidence she committed one of the 42 alleged "overt acts." Indeed, the evidence of such was overwhelming. For instance, three of the alleged overt acts related

to a phone call Maraglino was alleged to have made to Killgore, during which she gave Killgore her "permission" to go on a Hornblower dinner cruise with Perez that evening.[5] (*See* Lodgment No. 3, vol. 4 at 1177.)  Cell phone records showed that Maraglino called Killgore's cell at 6:05 p.m. on April 13, 2012, shortly after Killgore had texted her at Perez's urging.  (Lodgment No. 1, Rep.'s Tr. vol. 17 at 3156–57, ECF No. 16-17; vol. 18 at 3275–76, 3347, ECF No. 16-18.)  The conversation was overheard by Killgore's friend, Channy Tal,[6] who testified that Maraglino told Killgore she was unable to go on the dinner cruise because of her pregnancy and that she wanted Killgore to use the spare ticket and go with Perez.  (*Id.*, vol. 12 at 2068, 2072–73, 2119, 2123–24, ECF No. 16-12; vol. 18 at 3347.)  This evidence alone is sufficient to satisfy the overt act element.  *See People v. Russo*, 25 Cal. 4th 1124, 1128 (2001) (holding a "jury need not agree on a

/ / /

---

[5]  The jury instructions for alleged overt acts 12, 13 and 14 were as follows:

> OVERT ACT NO (12) On or about April 13, 2012, Dorothy Grace Marie Maraglino responded to a message from Brittany Killgore by calling Brittany Killgore on her cell phone.

> OVERT ACT NO. (13) On or about April 13, 2012, Dorothy Grace Marie Maraglino informed Brittany Killgore that Maraglino consented to Killgore going on the dinner cruise with Maraglino's boyfriend, Louis Ray Perez.

> OVERT ACT NO. (14) On or about April 13, 2012, Dorothy Grace Marie Maraglino told Brittany Killgore that Maragiono was not able to go on the dinner cruise and did not want the previously purchased dinner cruise tickets to go to waste.

(Lodgment No. 3, vol. 4 at 1177.)

[6] During the course of the proceedings, Channy Tal was married and took the surname "Foust."  During the trial, she was referred to by both her maiden and married name.  For the sake of consistency, the Court will refer to her by her maiden name.  (*See* Lodgment No. 1, vol. 12 at 1048–49.)

specific overt act as long as it unanimously finds beyond a reasonable doubt that some conspirator committed an overt act in furtherance of the conspiracy").

While not disputing the evidence of overt acts, Maraglino argues there was insufficient evidence to establish that she and Perez had agreed or intended to agree to kidnap Killgore.[7]  Under California law, "[e]vidence is sufficient to prove a conspiracy to commit a crime 'if it supports an inference that the parties positively or tacitly came to a mutual understanding to commit a crime.'"  *Dalton*, 7 Cal. 5th at 244 (quoting *People v. Maciel*, 57 Cal. 4th 482, 515–16 (2013)).  A factfinder may infer the existence of a conspiracy from the "conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy."  *Maciel*, 57 Cal. 4th at 515.

To prove an agreement, it is not necessary to establish the parties met and expressly agreed.  Rather, "a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design."  *People v. Johnson*, 57 Cal. 4th 250, 264 (2013) (quoting *People v. Vu*, 143 Cal. App. 4th 1009, 1025 (Cal. Ct. App. 2006); *see also People v. Thompson*, 1 Cal. 5th 1043, 1111 (2016); *Maciel*, 57 Cal. 4th at 515–16; *see also Homick*, 55 Cal. 4th at 870  (stating that the element of agreeing to commit a crime "must often be proved circumstantially").

Here, Maraglino cannot overcome the double layer of deference this Court must give to the state appellate court's decision.  *See Coleman*, 566 U.S. at 651.  When viewed in its totality and in the light most favorable to the state, there was more than sufficient evidence of an agreement between Perez and Maraglino to kidnap Killgore as part of a bondage, discipline, sadomasochism (BDSM) fantasy.  While the evidence against Maraglino was largely circumstantial, there was an abundance of it.  With some 40

---

[7] Because Lopez was acquitted of the conspiracy to commit kidnapping count, the Court will discuss only evidence relevant a conspiracy between Perez and Maraglino.  (*See* Lodgment No. 4, at 33, ECF No. 16-40.)

witnesses and nearly 400 exhibits introduced over the six week trial, the prosecution presented evidence in three general categories, (1) Maraglino's relationships, habits and proclivities prior to the murder, (2) her actions on the day of the murder and (3) her actions after Killgore was reported missing. All of this, when viewed together, amounted to sufficient evidence to support the jury's conclusion that Maraglino and Perez intended to, and did, agree to kidnap Killgore.

First, the prosecution presented evidence of Maraglino's and Perez's relationship and their history of participation in BDSM activities. "[T]he existence and nature of the relationship among the conspirators is undoubtedly relevant to whether such agreement was formed." *Homick*, 55 Cal. 4th at 871. As the appellate court noted, there was no dispute that Perez and Maraglino participated in BDSM activities, both together and with numerous other individuals over the years. (*See* Lodgment No. 1, vol. 8 at 1325–33, ECF No. 16-8; vol. 9 at 1437–38, ECF No. 16-9; vol. 11 at 1824, ECF No. 16-11.) Witnesses who had previously lived at Maraglino's house as part of a BDSM community testified that Perez and Maraglino were both sadists and the "dominants" of the household. (*Id.*, vol. 8 at 1329, vol. 9 at 1461–62.) Dora B., who lived in Maraglino's home as part of a BDSM "family" from October 2010 to July 2011, testified that Maraglino was a sadist in all her BDSM relationships, with the exception of Perez, with whom she assumed a subservient, or "slave" role. (*Id.*, vol. 8 at 1334–1335.)

Maraglino was known to be specifically interested in abduction and rape role-playing which included "kidnapping a girl off the street, taking her somewhere, playing with her, beating her, and raping her." (*Id.* at 1346–47; vol. 9 at 1415; vol. 11 at 1858, 1884.) Sometime in late 2010, Nicole A., a former member of the household, overheard Maraglino ask Dora B., another former housemate, what her reaction would be if a kidnapped woman was brought to the house.[8] (*Id.*, vol. 11 at 1858, 1884.) Writings

---

[8] Nicole A. testified on cross examination that, at the time, she assumed it was a joke to test Dora B.'s loyalty. (Lodgment No. 1, vol. 11 at 1884.)

recovered from Maraglino's house in her handwriting contained graphic depictions of such fantasies. (*Id.*, vol. 16 at 3857-59, ECF No. 16-16; vol. 19 at 3341, ECF No. 16-19; vol. 21 at 3706-07, ECF No. 16-21.)

Evidence showed that Maraglino and Perez had previously acted out some of these fantasies with other members of the BDSM community. Nicole A. recounted an incident which took place in 2010. (*See id.*, vol. 11 at 1822, 1870.) Nicole A. had been in a dominant/submissive relationship with Perez about a decade before and was interested in reestablishing a BDSM relationship with him and possibly Maraglino. (*Id.* at 1815–16, 1823–24.) Perez instructed Nicole A. to drive to Fallbrook, California and then call him for further instructions. (*Id.* at 1825–26.) She expected that she would get directions to Maraglino's house and the three would engage in BDSM "play." (*Id.* at 1826.) Instead, however, Perez directed Nicole A. to a parking lot of a shopping center and told her to wait for his call. (*Id.*) After several hours, Perez finally called. He told her to get in a truck that was parked next to her car and put on a blindfold. (*Id.* at 1828.) Nicole A. was surprised. When she got in the truck, Maraglino was in the driver's seat; Perez was not there. (*Id.* at 1829.) Nicole A. put on the blindfold. Maraglino did not speak or acknowledge her. (*Id.* at 1830.) Maraglino drove for a few minutes and when the truck stopped, a man she presumed to be Perez grabbed her arm, took her inside a house and led her down some stairs. (*Id.* at 1831–32.) Nicole A., who was still blindfolded, then felt Maraglino taking off her clothes. She heard Perez's voice, and the sound of him taking photographs. (*Id.* at 1834.) Maraglino put her in restraints and the three engaged in BDSM behavior. (*Id.* at 1835–37.) Nicole A. testified that she and Perez had not discussed (and she had not consented to) what they were going to do beforehand but she was ultimately "Okay with it" because she had known Perez previously. (*Id.* at 1835–36.)

While Nicole A. ultimately acquiesced to being taken to Maraglino's house under those circumstances, a reasonable juror could view this as evidence to show Maraglino and Perez had previously orchestrated scenarios which had at least some hallmarks of a

BDSM abduction fantasy. As discussed above, the existence of a conspiracy can be inferred from past "conduct, relationship, interests, and activities" of the alleged co-conspirators. *Dalton*, 7 Cal. 5th at 244; *Maciel*, 57 Cal. 4th at 515–16.

In addition, multiple witnesses testified that Maragilno disliked Killgore intensely. (Lodgment No. 1, vol. 10 at 1611–12, ECF No. 16-10; vol. 13 at 2253–55; vol. 14 at 2380.) She referred to Killgore as a "disease" and "herpes." (*Id.*, vol. 13 at 2256–57.) Maraglino was angry that Killgore had once fallen into Perez's lap while drunk at a gathering. (*Id.* at 2253–55.) She also complained about Killgore tagging along with her friend, Elizabeth Hernandez, whenever Hernandez visited. (*Id.* at 2254–55.) Maraglino made statements to Hernandez that she "could get rid of [Killgore] for [Hernandez] so [they] weren't together." (*Id.* at 2256.)

Viewed in isolation, the evidence of Maraglino's and Perez's BDSM activities, abduction fantasies and role-playing, and Maraglino's dislike of the victim would be insufficient to establish Maraglino's intent to conspire with Perez in Killgore's kidnapping. But when viewed within the context of the events of April 13, 2012 and the days that followed, a reasonable juror could conclude there was an agreement between the two, with specific intent to take Killgore against her will. *See McDaniel v. Brown*, 558 U.S. 120, 131 (2010) ("[A] reviewing court must consider all of the evidence admitted by the trial court" in the light most favorable to the verdict.)

On the afternoon of April 13, 2012, Hernandez, who was Killgore's best friend, dropped by Maraglino's house to return a camera charger.[9] (*Id.*, vol. 13 at 2267.) Perez was also there. (*Id.* at 2273–74.) While visiting with the two, Hernandez mentioned

_____

[9] Hernandez was friends with Maraglino and would drop by her house with some regularity. (*See* Lodgment No. 1, vol. 13 at 2243.) Killgore, who did not drive, often accompanied Hernandez on visits but did not socialize with Maraglino, Lopez or Perez on her own. (*Id.* at 2237.) Hernandez and Killgore knew Maraglino, Perez and Lopez were involved in the BDSM lifestyle but never participated. (*Id.* at 2253.)

having gone on a Hornblower dinner cruise recently. (*Id.* at 2281.) Hernandez told Maraglino and Perez she was planning to take Killgore on a Hornblower cruise as a belated birthday celebration before Killgore moved back to Pennsylania. (*Id.* at 2282–83.) Maraglino asked when Killgore was moving. (*Id.* at 2277.) When Hernandez told her Killgore was leaving in four days, Maraglino got "excited." (*Id.* at 2277–78.) Maraglino joked that Hernandez would "finally be free." (*Id.* at 2278.)

At the time, neither Maraglino nor Perez mentioned having tickets for a dinner cruise that night. Yet just a few hours after Hernandez left Maraglino's home, Perez showed up unannounced at Killgore's apartment to invite her to join him on a Hornblower dinner cruise that evening.[10] (*Id.*, vol. 12 at 2057.) When Perez arrived, Killgore and her friend, Channy Tal, were packing up Killgore's belongings for her upcoming move. (*Id.* at 2051.) Tal stayed in the bedroom while Killgore chatted with Perez in the living room, but she overheard their conversation. (*Id.* at 2056.) Killgore was surprised to see Perez because she did not know him well. He did not have her phone number and had never been to her apartment before. (*Id.* at 2055.) When Killgore asked Perez how he knew where she lived, he told her he had "asked around." (*Id.* at 2058.)

Perez told Killgore he had two tickets for a Hornblower cruise that night but Maraglino was unable to go. (*Id.* at 2059.) He offered the spare ticket to Killgore. (*Id.* at 2060.) Killgore declined, telling him she was going to spend the evening with friends. Perez was persistent. (*Id.* at 2057, 2060.) Killgore also expressed concern that Maraglino would be upset if she went with Perez. After a few more unsuccessful attempts to convince Killgore to join him on the dinner cruise, Perez left. (*Id.* at 2060.) Before departing, Perez and Killgore exchanged phone numbers. (*Id.* at 2062.)

---

[10] Surveillance video showed Perez had parked outside the apartment complex and entered on foot at approximately 4:38 p.m., wearing a hoodie which partially obscured his face. (Lodgment No. 1, vol. 13 at 2210–11.)

19cv0109 LAB (KSC)

Perez admitted at trial that he never had tickets for a dinner cruise. (*Id.*, vol. 21 at 3651, ECF No. 16-21; vol. 22 at 3848, ECF No. 16-22.) After he left Killgore's apartment, Perez texted Maraglino, "That guy wasn't successful." (*Id.*, vol. 15 at 2642-43; vol. 18 at 3267.) A reasonable juror could infer from this that Maraglino was aware of Perez's attempts to convince Killgore to go on a cruise, despite not having tickets.

Surveillance video showed Perez leaving Killgore's apartment complex a 4:54 p.m. (*Id.*, vol. 13 at 2212.) Killgore and Tal got back to packing and shortly thereafter, Tal noticed Killgore texting frequently. (*Id.*, vol. 12 at 2064.) Cell phone records and recovered text messages showed that a few minutes after Perez left, Killgore texted him to ask if he knew anyone who could help her move. (*Id.*, vol. 18 at 3266–67.) He responded via text that if she went out with him that evening, he would have "five guys there in the morning." (*Id.* at 3267.) She responded that, while moving help would be appreciated, she did not think Maraglino would approve of her going out with him. She told him she assumed Maraglino did not like her. (*Id.* at 3267–68.) Perez replied that it was not true and suggested Killgore text Maraglino and ask for her blessing to join him on the cruise. (*Id.* at 3269–70.) He followed up with another text about 20 minutes later, asking Killgore if she had contacted Maraglino yet. At 5:41 pm, Killgore responded that she would contact Maraglino shortly. (*Id.* at 3271–72.) Meanwhile, at 5:42 p.m. (before speaking to Killgore), Maraglino conducted an internet search for "San Diego dinner cruise." (*Id.*, vol. 18 at 3341–42.)

Killgore called Maraglino at 5:55 p.m. and left a voicemail. (*Id.*, vol. 12 at 2067; *see also id.*, vol. 18 at 3274.) About ten minutes later, Maraglino called Killgore back. (*Id.*, vol. 12 at 2068; vol. 17 at 3156–57; vol. 18 at 3275–76, 3347.) As discussed above, Tal overheard both sides of the conversation. (*Id.*, vol. 12 at 2068.) Killgore asked Maraglino if it would be okay if she went on the dinner cruise with Perez. Tal heard Maraglino respond that it was fine. (*Id.* at 2068, 2073.) Maraglino lied and told Killgore that Perez had bought two tickets but she could not go because she was pregnant and was

///

concerned about seasickness. (*Id.* at 2073.)  She told Killgore she did not want the ticket to go to waste. (*Id.*)  After the call ended, Maraglino conducted an internet search for "Hornblower dinner cruise." (*Id.*, vol. 18 at 3341–44, 3359–60.)

At 6:10 p.m., Killgore texted Perez that she would go with him. (*Id.* at 3347.) Killgore also texted Hernandez that she was going out with Perez, which Hernandez thought was strange because the two rarely spoke.  Perez texted Killgore that he would pick her up at her Fallbrook apartment at 7:30 p.m. (*Id.* at 3277–78.)  The San Diego Hornblower dinner cruise departed at 7:00 p.m. that evening from San Diego Harbor. (*Id.*, vol. 21 at 3651.)

A reasonable juror could view all of this evidence as showing that Perez and Maraglino planned the ruse in an attempt to get Killgore to leave her apartment with Perez voluntarily, in order to avoid detection.  In addition, text messages reveal that when Perez arrived to pick up Killgore, he attempted to avoid entering the apartment complex parking lot, where there was video surveillance, claiming he was running late and did not want them to "miss [their] boat." (*Id.*, vol. 18 at 3282.)  He only did so after Killgore insisted he "drive into the complex" because it was raining. (*Id.* at 3281.)

At 7:37 p.m. Perez texted Killgore he had arrived; she is then seen on video surveillance entering his car. (*Id.*, vol. 13 at 2216, vol. 18 at 3282.)  At 7:39 p.m. Killgore texted a friend, apologizing for cancelling their plans that evening.  At 7:40 p.m., Perez's car exited the apartment complex. (*Id.* at 2215–17.)  Ten minutes later, at 7:50 p.m., Killgore texted her friend Tal, "Help." (*Id.*, vol. 12 at 2081–83; vol. 18 at 3282.)

Shortly thereafter, at 7:57 p.m., Perez texted Maraglino, "Kitten?" (*Id.*, vol. 18 at 3283.)  At that time, Maraglino and Lopez were shopping at an Albertson's a few blocks from Maraglino's house.[11] (*Id.*, vol. 12 at 2133–15; 14 at 2257–64; vol. 18 at 3309.)  At

_____

[11] Maraglino and Lopez were captured on store camera surveillance at 7:57 p.m., checking out at the register.  An Albertson's employee testified that one of them said she

8:11 p.m., Perez texted Maraglino, "Come home." (*Id.*, vol. 18 at 3285.)  They left the store at 8:12 p.m.  (*Id.*, vol. 14 at 2501–03, 2515–13, 2516–2520.)  A neighbor of Maraglino's reported seeing Perez's white Ford Explorer pulling into Maraglino's lot "kind of fast" at about dusk that evening.  (*Id.*, vol. 13 at 2175–77, 2183.)   When viewed in the light most favorable to the verdict, a reasonable juror could infer form all of this communication back and forth between Perez, Maraglino and Killgore, and Perez's attempts to avoid detection, that Perez and Maraglino were executing a plan to get Killgore to Maraglino's house against her will.

In addition, there was substantial evidence that Maraglino attempted to cover up the crime in the hours and days after Killgore went missing, which a reasonable juror could consider as circumstantial evidence of her guilt.  The jury was instructed that it could consider such attempts to hide or fabricate evidence as "consciousness of guilt" to support the conspiracy conviction, but that such evidence alone was not sufficient.[12]

---

needed to get her wallet and left the store to retrieve it while the other stayed behind.  The one who had left returned to the store at 8:10 p.m., finished the transaction and the two departed at 8:12 p.m.  (*Id.*, vol. 14 at 2499–500, 2505, 2516–17.)

[12] The jury was instructed on consciousness of guilt under California standard jury instruction, CALCRIM No. 371, as follows:

> If the defendant tried to hide evidence or discourage someone from testifying against him or her that conduct may show that he or she was aware of his or her guilt.  If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance.  However, evidence of such an attempt cannot prove guilt by itself.

> If the defendant tried to create false evidence or obtain false testimony, that conduct may show that he or she was aware of his or her guilt.  If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance.  However, evidence of such an attempt cannot prove guilt by itself.

> If someone other than the defendant tried to create false evidence, provide false testimony, or conceal or destroy evidence, that conduct may show

(Lodgment No. 3, vol. 1146; *see also* Lodgment No. 1 vol. 26 at 4281–82, ECF No. 16-26.)

Tal testified that she saw Killgore's 7:50 p.m. "help" text at 8:02 and immediately responded with texts and a call to Killgore's cell phone, asking if she was okay. (*Id.*, vol. 12 at 2082–84, vol. 18 at 3242–45, 3283, 3306, 3308.) At 8:05 p.m., Tal received a response to her last text ("Are you okay"), saying: "Yes, I love this party." (*Id.*, vol. 12 at 2085, 2092; vol. 18 at 3284.) Tal was suspicious because it was "not the way [Killgore] text[ed]." (*Id.*, vol. 12 at 2085.) Tal asked Killgore to call her if she was "really okay" and received a text response, "In a few, hot guys." (*Id.* at 2093; vol. 18 at 3284.) Tal remained alarmed by the strange tone of the text and responded by demanding that Killgore call her immediately. (*Id.*, vol. 12 at 2085–92; vol. 18 at 3283.) Two calls were placed from Killgore's cell phone to Tal at 8:09 p.m. and 8:10 p.m. The first was a hang-up and on the second, Tal heard only loud music. (*Id.*, vol. 12 at 2093.)

Shortly thereafter, Tal alerted Hernandez about the situation and Hernandez also attempted to reach Killgore by calling her at 8:12 p.m., with no response. (*Id.*, vol. 18 at 3285–86.) At this time, cell phone tower location data indicated Killgore's phone was "very close" to Maraglino's Fallbrook home. (*Id.* at 3306–07, 3311.) At 8:16 p.m., Hernandez texted Maraglino, "Hey, what's going on with [Perez] and Brittany." (*Id.* at 3285–3286.) When she received no response, Hernandez called Maraglino again at 8:21

the defendant was aware of his or her guilt, but only if the defendant was present and knew about that conduct, or, if not present, authorized the other person's actions. It is up to you to decide the meaning and importance of this evidence. However, evidence of such conduct cannot prove guilt by itself.

If you conclude that a defendant tried to hide evidence or authorized another person to hide evidence you may consider that conduct only against that defendant. You may not consider that conduct in deciding whether any other defendant is guilty or not guilty.

(Lodgment No. 3, vol. 4 at 1146.)

p.m. This time Maraglino picked up. (*Id.*, vol. 18 at 3286.) Hernandez told Maraglino she knew Killgore had made plans with Perez and wanted to know where Killgore was. Maraglino claimed she had no idea what Hernandez was talking about, that she had not spoken to Killgore, and insisted she would never have done so because she did not like her. [13] (*Id.*, vol. 13 at 2297–98, 2301; vol. 18 at 3286.)

Maraglino also lied to law enforcement. When she was interviewed by detectives on April 14, the morning after Killgore went missing, she admitted that Killgore had called her the day before but claimed Killgore never asked her about going out with Perez that evening. (Lodgment No. 3, vol. 5 at 1253.) Maraglino maintained that Killgore had only asked her if Perez could help her move. Maraglino told detectives she would never have given permission for Killgore to go out drinking with Perez. (*Id.*) This was in direct contradiction to what Tal overheard. (*See* Lodgment No. 1 vol. 12 at 2068, 2073.) It also contradicted what Maraglino told Hernandez—that she never spoke to Killgore at all on April 13. (*See id.*, vol. 13 at 2297–98.)

After detectives found Lopez and her "suicide letters" at the Ramada Inn on April 17, law enforcement contacted Maraglino again. (*Id.*, vol. 19 at 3504, 3513.) By that time, she had left San Diego for Virginia. (*See* Lodgment No. 3, vol. 5 at 1257.) Maraglino spoke to Detective Patterson on the phone and told him that on the evening of April 13, she and Lopez had watched a movie, "Adventures of Rin Tin" On Demand. (*Id.* at 1260; *see also* Lodgment No. 1, vol. 19 at 3512–16.) Maraglino's On Demand

---

[13] After the call between Killgore and Hernandez, there were no cell phone or text communications from Perez, Maraglino, Lopez or Killgore's phone until 8:40 p.m, when Killgore's friend, Jessica Perry, called Perez. (Lodgment No. 1, vol. 18 at 3313.) Perez told Perry that he and Killgore had gone to downtown San Diego to "party"; he had seen Killgore talking to some guys and then she had disappeared. (*Id.*, vol. 12 at 2149–50.) Cell tower data, however, indicated that at that time Perez in the vicinity of Maraglino's Fallbrook house. (*Id.*, vol. 18 at 3313–3314.) Calls from friends to Killgore's cell phone during that time period went straight to voicemail, indicating that the phone had been turned off. (*Id.*, vol. 12 at 2096–97.)

account showed that the movie was purchased at 9:08 p.m. on April 14, 2012.  No movie was purchased on April 13.  (Lodgment No. 1, vol. 19 at 3518.)

During the same April 17, 2012 phone interview, Maraglino told Detective Patterson that when she left for the store with Lopez at about 7:00 p.m. on April 13, Perez was getting dressed to go out.  She did not see him again until about midnight.  (Lodgment No. 3, vol. 5 at 1261.)  When the detective told her Perez had reported stopping by the house with Killgore after picking her up, Maraglino became flustered.  She said that maybe they tiptoed around her while she slept on the couch.  She repeatedly responded to the detective's questions with "I don't recall" and "I did not see her."  (*Id.* at 1265–67.)  She became increasingly frustrated, insisting to Detective Patterson that he would not get her to contradict Perez.  She then hung up on him.  (*Id.* at 1266–67.)

By April 19, 2012, Maraglino had a new cell phone number.  And the cell phone Maraglino had in her possession when she was arrested weeks later[14] was not the phone she had used on April 13, 2012.  (Lodgment No. 1, vol. 19 at 3533.)  That phone was recovered nearly eighteen months later in Missouri, in a closet in the apartment of Maraglino's brother, under several suitcases, disassembled, and without a battery.  (*Id.* at 3529–30, 3536; vol. 21 at 3710.)  Forensic examination of the cell phone revealed that Maraglino had deleted much of the phone's content, including texts between herself and Killgore.  (*Id.*, vol. 17 at 3179–84.)  Law enforcement was nonetheless able to retrieve the deleted messages from Verizon.  (*Id.* at 3179–82.)

Based on the evidence of numerous and varied lies Maraglino told different people after Killgore went missing, a reasonable juror could infer that Maraglino had originally assumed no one knew she had spoken to Killgore on April 13 and given her blessing to go on the "date" with Perez.  And when viewed in the light most favorable to the

---

[14] Maraglino was arrested on May 10, 2012 at a hotel in downtown San Diego.  (Lodgment No. 1, vol. 21 at 3666.)

prosecution, Maraglino's repeated lying about it supports an inference that, from the beginning, Maraglino was part of the plan to dupe Killgore into accepting Perez's invitation.

As she did on direct appeal, Maraglino claims that her initial internet searches show she looked up generic "dinner cruises" as opposed to the specific "Hornblower" dinner cruise. (*See* Pet. at 14–15.)   She contends that she did not know the Hornblower dinner cruise set off at 7:00 p.m. until after she spoke to Killgore and as such, she did not knowingly deceive Killgore to get her to go with Perez.  (*Id.* at 15.)   Maraglino's defense counsel made these same arguments at trial and given the verdict, it is clear the jury rejected them.  (*See* Lodgment No. 1, vol. 27 at 4510–11, 4518–19.)   The *Jackson* standard "leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial" and does not permit "fine-grained factual parsing." *Coleman*, 566 U.S. at 655.  Maraglino's argument is based on the notion that innocent alternate explanations undercut the reasonableness of the jury's inferences; but whether an explanation was believed is solely a question for the jury.  It is not for this Court to second-guess the jury's decision to credit or discredict a particular explanation where, as here, the jury's ultimate conclusion is based on reasonable inferences supported by the evidence as a whole.  *See Cavazos*, 565 U.S. at 7 (holding that *Jackson* "unambiguously instructs that a reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'")

In sum, Maraglino has not overcome the "doubly deferential" standard of review under AEDPA and *Jackson*.  When viewed in the light most favorable to the verdict, the evidence was sufficient to support Maraglino's conspiracy conviction. *See Juan H*., 408 F.3d at 1275; *see also Jones v. Wood*, 207 F.3d 557, 563 (9th Cir. 2000) (finding sufficient evidence for murder conviction where "evidence was almost entirely circumstantial and relatively weak").  Specifically, given the evidence of Maraglino's

relationship with Perez, her interest in BDSM generally and abduction fantasies in particular, coupled with evidence of her actions before and after Maraglino got into Perez's car on April 13, 2012, a reasonable jury could infer Maraglino was guilty of conspiracy to commit kidnapping beyond a reasonable doubt. *See Walters*, 45 F.3d at 1358. The state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established law. *See Williams*, 529 U.S. at 412-13; 28 U.S.C. §2254(d)(1). Moreover, the state court's adjudication did not involve an "unreasonable determination of the facts in light of the evidence presented in the state court proceedings," because Petitioner has not demonstrated that the state court factual findings are objectively unreasonable. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); 28 U.S.C. § 2254(d)(2).

### 3. *Kidnapping*

Next, Maraglino contends her kidnapping conviction was based on insufficient evidence. (Pet. at 13.) She raised this claim in her petition for review to the California Supreme Court which was denied without comment or citation. (*See* Lodgment Nos. 16 & 18.) This Court therefore looks through to the last reasoned state court opinion, that of the California Court of Appeal. *See Ylst*, 501 U.S. at 805–06. The appellate court denied the claim, stating in part:

> [T]here is sufficient evidence Maraglino aided and abetted the kidnapping (and conspired to kidnap, as we discuss in the following section). The jury could infer Maraglino and Perez planned the Hornblower ruse after Hernandez stopped by and mentioned Killgore's interest in going. Maraglino searched the Internet for "dinner cruise" and "Hornblower San Diego" after Hernandez left and while Perez was trying to convince Killgore to go. Maraglino then lured Killgore to accompany Perez. Killgore told Perez she was reluctant to party with him and would "need [Maraglino] to say it was ok" to go. She expressed similar reservations to Tal. On Perez's urging, she called Maraglino. Maraglino laughed and told Killgore to go use her ticket because she was pregnant and would get seasick. Killgore told Tal

/ / /

/ / /

she decided to go after speaking to Maraglino and texted Perez, "Ok I talked to [D]ee [Maraglino] and she [said] she was good with it so i[']ll go." The jury could infer that Killgore would not have gone without Maraglino's encouragement.

(Lodgment No. 14 at 44.)

The appellate court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established law. Under California law, kidnapping has three elements: (1) a person was unlawfully moved by the use of physical force or fear; (2) the movement of the person was for a substantial distance and (3) the movement was without the person's consent. *People v. Bell,* 179 Cal. App. 4th 428, 435 (Cal. Ct. App. 2009); *People v. Jones*, 108 Cal. App. 4th 455, 462 (Cal. Ct. App. 2003).

The second element – that the victim be moved a substantial distance – is commonly known as the "asportation" element. *People v. Rayford*, 9 Cal. 4th 1, 14, 36 Cal. Rptr. 2d 317 (1994). Kidnapping requires asportation of the victim be accomplished by force or instilling fear. *People v. Majors*, 33 Cal. 4th 321, 326 (2004). This does not require physical compulsion. (*Id*. at 326–27.) Rather, where the victim reasonably feels compelled under the circumstances to comply with the defendant's orders under fear of harm or injury from the defendant, the asportation is forcible. *Id*. at 327. "In contrast, where the perpetrator tricks the victim into the asportation by fraud, deceit, enticement, or false promises, without application of the requisite force or fear, there is no kidnapping." *People v. Alvarez*, 246 Cal. App. 4th 989, 1002 (Cal. Ct. App. 2016).

Here, there was no evidence Maraglino herself physically participated in abducting Killgore. Rather, it was the prosecution's theory that Perez perpetrated the kidnapping and Maraglino was guilty as an aider and abettor or co-conspirator (or both). (*See id.*, vol. 26 at 4385–90, 4398, 4403-05, ECF No. 16-26.) California law extends liability as principals in a crime to "[a]ll persons concerned in the commission of a crime," and all those who "aid and abet in its commission." Cal. Penal Code § 31. A defendant who herself commits the offense is guilty as a direct perpetrator; if she assists another, she is

guilty as an aider and abettor. *See People v. Perez*, 35 Cal. 4th 1219, 1225 (2005). Moreover, each member of a conspiracy is criminally responsible for the acts of fellow conspirators, including the target offense and any other offense committed in furtherance of, and which follow as a natural and probable consequence of, the conspiracy. *People v. Medina*, 46 Cal. 4th 913, 920 (2009); *In re Hardy*, 41 Cal. 4th 977, 1025–1026 (2007). Thus, in order to find Maraglino guilty under either an aider and abettor theory or conspiracy theory, the jury had to first find Perez guilty as the direct perpetrator.

The evidence against Perez was overwhelming. When viewing the evidence in the light most favorable to the verdict, a reasonable juror could infer that Perez lied to Killgore about having tickets to the Hornblower cruise in order to get her to enter his car voluntarily. Perez's unsuccessful attempt to avoid driving into Killgore's apartment complex, where there were surveillance cameras, suggests he sought to avoid detection. While nothing on the surveillance footage shows Perez using "force or fear" to get Killgore to enter his vehicle, ten minutes after Perez's car exited Killgore's apartment complex, Killgore texted Tal, "Help." (Lodgment No. 1, vol. 12 at 2081–83; vol. 8 at 3282.) A reasonable juror could surmise that, at that stage, Killgore was no longer a willing passenger.

In addition, a stun baton, disposable gloves and handcuffs were recovered from Perez's vehicle. (*Id.*, vol. 14 at 2574, 2578, 2580; vol. 15 at 2707, 2777.) Killgore's DNA was found on the prongs of the stun baton and Perez's DNA was on the handle. (*Id.* at 2932–33, 2935.) Postmortem evidence indicated the stun baton was used on the left side of Killgore's face (*id.*, vol. 19 at 3472, 3475–76), suggesting Perez used force to restrain her while she was still a passenger in his car. Perez admitted at trial that after he picked Killgore up, he took her to Maraglino's house. (*Id.*, vol. 22 at 3873.) A neighbor also reported seeing Perez's white Ford Explorer at dusk that evening, backing "kind of fast" into Maraglino's lot and disappearing behind the fence. (*Id.*, vol. 13 at 2175–77, 2183.)

/ / /

When viewed in the light most favorable to the verdict, a reasonable juror could conclude from this evidence that shortly after getting into Perez's car, Killgore realized she had been deceived. Her text for help, the stun baton, and the injuries to the left side of her face, support the conclusion that Perez moved Killgore a substantial distance (to Maraglino's house) by means of force or fear and without her consent. Thus, the state appellate court reasonably concluded that sufficient evidence supported Perez's conviction as the direct perpetrator of Killgore's kidnapping. (*See* Lodgment No. 6 at 41–44.)

Maraglino appears to argue that there was insufficient evidence to support her kidnapping conviction because there was insufficient evidence to support her conspiracy to kidnap conviction. As discussed above, the state court reasonably concluded that sufficient evidence supported the jury's conclusion that Maraglino conspired with Perez to commit the kidnapping. And as such, given the evidence that Perez was the direct perpetrator, Maraglino is by definition, guilty of kidnapping as his co-conspirator. *See People v. Zacarias*, 157 Cal. App. 4th 652, 660 (Cal. Ct. App. 2007) (stating that a conspirator is guilty of acts committed by their co-conspirators, including the target offense, if it is committed).

Even assuming arguendo that there was insufficient evidence to support Maraglino's conspiracy conviction, there was nonetheless sufficient evidence to support her kidnapping conviction as an aider and abettor. For Maraglino to be guilty of kidnapping on an aiding and abetting theory, the prosecution had to prove: (1) Perez kidnapped Killgore; (2) Maraglino knew of Perez's unlawful intent and intended to assist him in the offense; and (3) Maraglino engaged in conduct that in fact assisted Perez in achieving the kidnapping. *See Perez*, 35 Cal. 4th 1219 at 1225.

Much of the same evidence which supported Maraglino's conspiracy conviction, discussed above at length, also supports her conviction for kidnapping as an aider and abettor. A reasonable juror could have inferred from the evidence that Maraglino and Perez came up with the idea to dupe Killgore into accepting an invitation to accompany

him on the dinner cruise after hearing about the cruise from Hernandez when she visited them on the afternoon of April 13, 2012. When Killgore declined Perez's invitation, he immediately texted Maraglino that he was "not successful." It was Maraglino who ultimately intervened, calling Killgore and convincing her to go on the cruise with Perez. The evidence further suggested she knew Perez had no intention of taking Killgore on the cruise. Maraglino lied to Killgore about having tickets. She lied to Hernandez about talking to Killgore that evening. And she lied to detectives about giving Killgore her permission to go out with Perez that night. When all the evidence is viewed in the light most favorable to the prosecution, a reasonable juror could conclude that Maraglino was in on the plan to kidnap Killgore and indeed was crucial in assisting Perez in executing it by manipulating Killgore into leaving with Perez that night. Thus, a rational juror could find that Maraglino aided and abetted Killgore's kidnapping.

In sum, the evidence, and the reasonable inferences a rational juror could draw from it, supports Maraglino's kidnapping conviction under both the co-conspirator theory and the aiding and abetting theory. The state court's denial of Petitioner's claim was neither contrary to, nor an unreasonable application of clearly established law set forth in *Jackson*. *See Williams*, 529 U.S. at 412-13; 28 U.S.C. §2254(d)(1). Nor was it based on an unreasonable determination of the facts in light of the state court record. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); 28 U.S.C. § 2254(d)(2).

### 4.     *First Degree Felony Murder*

Maraglino also challenges the sufficiency of evidence to support her murder conviction. (*See* Pet. at 6, 13, ECF No. 3.) She raised this claim in her petition for review to the California Supreme Court, which was denied without comment or citation. (*See* Lodgment Nos. 16 & 18, ECF Nos. 16-51, 16-53.) Thus, this Court looks through to the opinion of the California Court of Appeal. *See Ylst*, 501 U.S. at 805–06. The appellate court denied claim, stating, in relevant part:

/ / /

/ / /

> Maraglino broadly challenges the sufficiency of the evidence for all of her convictions on the basis there was no evidence she knew of any plan to commit a criminal offense against Killgore. As discussed above, we conclude there is ample evidence supporting her culpability for kidnapping as a direct aider and abettor and as a conspirator with Perez. Although we found insufficient evidence supporting her convictions for torture or attempted sexual battery, the kidnapping conviction alone is sufficient to sustain her first degree felony murder conviction.

(Lodgment No. 14 at 69.)

California's felony-murder rule makes a killing while committing certain felonies murder without the necessity of further examining the defendant's mental state. First degree felony murder is a killing during the course of committing a specified felony. Cal. Penal Code § 189. Murder committed in the perpetration of or attempt to perpetrate kidnapping is felony murder in the first degree. *Id*.; *see also People v. Booker*, 51 Cal. 4th 141, 175 (2011).

The mental state required for first degree felony murder is "simply the specific intent to commit the underlying felony." *People v. Clark*, 63 Cal. 4th 522, 615 (2016) (quoting *People v. Cavitt*, 33 Cal. 4th 187, 197 (2004)). The actus reus requirement for an aider and abettor to first degree felony murder is aiding and abetting the underlying felony or attempted felony that results in the murder. Cal. Penal Code §§ 31, 189. A defendant must have "harbored the felonious intent either prior to or during the commission of the acts which resulted in the victim's death." *People v. Brooks*, 2 Cal. 5th 674, 733 (2017) (quoting *People v. Ainsworth*, 45 Cal. 3d 984, 1016 (1988). First degree felony murder "does not require proof of a strict causal or temporal relationship between the felony and the killing. *Brooks*, 2 Cal. 5th at 733.

In Maraglino's case, the jury was instructed that to establish first degree felony murder, the prosecution was required to prove Maraglino (1) "aided and abetted, or was a member of a conspiracy to commit kidnapping"; (2) "intended to aid or abet the perpetrator in committing or intended that one or more of the members of conspiracy commit kidnapping. . ."; (3) the perpetrator, whom Maraglino was aiding and abetting or

with whom Maraglino conspired, personally committed or attempted to commit kidnapping; and (4) while kidnapping or attempting to kidnap Killgore, the perpetrator caused her death.[15] (*See* Lodgment No. 3, vol. 4 at 1161; *see also* CALCRM No. 540B.)

Here, for the reasons discussed above in sections V(A)(2) and V(A)(3) of this Order, when the evidence is viewed in the light most favorable to the verdict, a reasonable juror could conclude that Maraglino conspired with Perez to kidnap Killgore and that she also aided and abetted the kidnapping, which was perpetrated by Perez. A reasonable juror viewing the evidence in the light most favorable to the verdict could conclude that during the of execution of that plan, Killgore was killed. The question of whether Killgore was killed intentionally or accidentally is irrelevant, as is the question of whether it was Perez, Lopez or Maraglino who physically caused her death. *See Brooks*, 2 Cal. 5th at 733. This is sufficient to support her conviction for felony first degree murder. The state appellate court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established law. *See Williams*, 529 U.S. at 407–08. Likewise, the it was not based on an unreasonable determination of the facts. *See Miller-El*, 537 U.S. at 340.

### 5. *Conclusion*

For the foregoing reasons, Maraglino has failed to establish the state court's denial of her claims of insufficient evidence to support her convictions for conspiracy to kidnap, kidnap and felony murder was contrary to, or an unreasonable application of clearly established law. *See* 28 U.S.C. § 2254(d)(1); *Williams*, 529 U.S. at 407–08. Further, the state court's decision was not an unreasonable determination of the facts in light of the state court record. *See* 28 U.S.C. § 2254(d)(2); *Miller-El*, 537 U.S. at 340. Therefore, claim one is **DENIED** in its entirety.

---

[15] The instruction given the jury also included torture as a possible underlying felony. (*See* Lodgment No. 3, vol. 4 at 1161.) Because the California Court of Appeal reversed Maraglino's torture conviction, the instruction's references to torture are omitted.

## B.    Ground Two: Kidnapping Special Circumstance

In ground two Maraglino argues that even if there was sufficient evidence to convict her of the above counts, there was insufficient evidence to support the jury's true finding on the special circumstance allegation that Killgore was murdered while Maraglino was committing or aiding and abetting her kidnapping.  (Pet. at 7, 15–16.) Specifically, she contends her due process rights were violated because there was insufficient evidence to show she was a "major participant" in the murder, as required under California Penal Code sections 190.2(d) and 190.2(a)(17)(B).  As a result, she further claims her sentence to life in prison without the possibility of parole violates her Eighth Amendment right to be free from cruel and unusual punishment.  (*See id.*)

### *1.    State Court Decision*

Petitioner raised this claim in her petition for review to the California Supreme Couth, which was denied without comment or citation.  (*See* Lodgment Nos. 16 & 18.) As such, this Court looks through to the reasoned opinion of the California Court of Appeal.  *See Ylst*, 501 U.S. at 805–06.   It denied the claim, stating in relevant part:

> What is sufficient to establish the elements for first degree felony murder is not necessarily sufficient to establish first degree special circumstance felony murder. (*Clark*, supra, 63 Cal.4th at p. 616.)  This is because the United States Supreme Court has ruled it unconstitutional under the Eighth Amendment to "treat all felony murderers as equally culpable and eligible for death." (*Banks*, supra, 61 Cal.4th at p. 810.)  The Eighth Amendment requires states to offer guidance to differentiate those for whom death is appropriate from those for whom it is not. (*Id.* at p. 797.)  [Footnote 34:  Although the standards articulated for capital liability of aiders and abettors were developed in death penalty cases, they apply equally in cases involving eligibility under section 190.2, subdivision (d) for life imprisonment without parole. (*Banks*, supra, 61 Cal.4th at p. 804.)]
>
> California uses a two-step process—first, looking to the existence of one or more special circumstances, rendering the defendant death eligible (§ 190.2, subd. (a)), and second, evaluating aggravating and mitigating factors to determine if death or life imprisonment without parole is appropriate (§ 190.3). (*Banks*, supra, 61 Cal.4th at p. 797.)  Relevant here, the kidnapping special circumstance recognizes capital liability for a murder

"committed while the defendant was engaged in, or was an accomplice in, the commission of . . . [¶] . . . [¶] Kidnapping in violation of Section 207." (§ 190.2. (a)(17)(B).)

"The standard of review for a sufficiency of the evidence claim as to a special circumstance is whether, when evidence that is reasonable, credible, and of solid value is viewed 'in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the allegation beyond a reasonable doubt.'" (*Clark*, supra, 63 Cal.4th at p. 610.) This is the same standard applied to review the sufficiency of the evidence supporting a conviction. (*Banks*, supra, 61 Cal.4th at p. 804.)

We conclude there is sufficient evidence to support the jury's true findings as to the kidnapping special circumstance allegation as to all three defendants.

. . . .

"The special circumstances statute extends death eligibility not only to killers, but also to certain aiders and abettors of first degree murder." (Banks, supra, 61 Cal.4th at p. 797.) "In order to support a finding of special-circumstance murder . . . against an aider and abettor who is not the actual killer, the prosecution must show either that the aider and abettor had intent to kill (§ 190.2, subd. (c)) or acted with reckless indifference to human life while acting as a major participant in the underlying felony. (§ 190.2, subd. (d).)" (*People v. Bustos* (1994) 23 Cal.App.4th 1747, 1753.) [Footnote 36 omitted.] In other words, where an aider and abettor of felony murder lacks the intent to kill, section 190.2, subdivision (d) "imposes both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference with human life" to convict of special-circumstances murder eligible for death. (*Banks*, supra, p. 798.) The California Supreme Court defined both of those elements— "major participant" and "reckless indifference to human life"—in *Banks*.

To be a "major participant" in a felony, "a defendant's personal involvement [in the crimes leading to the victim's death] must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder." (*Banks*, supra, 61 Cal.4th at p. 802.) A jury "must consider the totality of the circumstances" to determine "whether a defendant's culpability is sufficient to make him or her death eligible." (*Id.* at pp. 802, 803.) Among the factors to consider:

19cv0109 LAB (KSC)

"What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?"

(*Banks*, supra, 61 Cal.4th at p. 803.)

"No one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Banks*, supra, 61 Cal.4th at p. 803.) Instead, all of these factors "may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' [citation] was sufficiently significant to be considered 'major' [citations]." (*Ibid*.) "In cases where lethal force is not part of the agreed-upon plan, absence from the scene may significantly diminish culpability for death." (*Id*. at p. 803, fn. 5; see *Clark*, supra, 63 Cal.4th at p. 614.)

"Reckless indifference to human life" under section 190.2, subdivision (d) can be determined under either a subjective or objective standard. (*Clark*, supra, 63 Cal.4th at p. 617.) Under the subjective standard, "[t]he defendant must be aware of and willingly involved in the violent manner in which the particular offense is committed, demonstrating reckless indifference to the significant risk of death his or her actions create." (*Banks*, supra, 61 Cal.4th at p. 801.) Under this standard, there must be evidence the defendants "'subjectively appreciated that their acts were likely to result in the taking of innocent life.'" (*Id*. at pp. 801–802.) "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies the constitutional minimum." (*Id*. at p. 808.) Likewise, mere participation in inherently dangerous felonies subject to first degree felony murder treatment does not suffice to show that a defendant acted with reckless indifference to human life. (*Id*. at pp. 809–810.)

By contrast, the objective standard considers "what 'a law abiding person would observe in the actor's situation.'" (*Clark*, supra, 63 Cal.4th at p. 617.) "[A] defendant's good faith but unreasonable belief that he or she

was not posing a risk to human life in pursuing the felony does not suffice to foreclose a determination of reckless indifference to human life." (*Id*. at p. 622.) Among the factors to consider for objective recklessness are: (1) defendant's knowledge weapons will be used, defendant's personal use of weapons, and the number of weapons involved; (2) defendant's physical presence and opportunities to prevent the murder and/or aid the victim; (3) the duration of the felony and whether the victim was murdered after a prolonged period of restraint; (4) the defendant's knowledge of a cohort's likelihood of killing; and (5) the defendant's efforts to minimize the risks of violence in the commission of the felony. (*Id*. at pp. 618–623.)

Maraglino contends there is insufficient evidence she acted with intent to kill—or that she was a major participant in the kidnapping who acted with reckless indifference to human life. As a result, she argues her sentence of life without parole violates the Eighth Amendment. We disagree and conclude the jury could reasonably infer she was both a major participant and acted with reckless indifference to human life. (§ 190.2, subd. (d).)

There is sufficient evidence to support the inference Maraglino was a major participant in the kidnapping. Killgore made it clear she would not accompany Perez on the dinner cruise without Maraglino's approval. Maraglino provided essential assistance, convincing Killgore to accompany Perez. The jury could infer she helped plan the kidnapping conspiracy shortly after Hernandez came and told them about her recent experience on the Hornblower cruise. After Killgore initially declined the invitation, Perez texted Maraglino, "That guy wasn't successful," and Maraglino responded, "Tomorrow is another day." As Perez was trying to convince Killgore to go on the cruise, Maraglino was searching the Internet on her phone for "dinner cruise" and "Hornblower San Diego."

After the "Help" text, when Hernandez called Maraglino worriedly, Maraglino denied having spoken to Killgore. That night, she told Perez to get rid of Killgore's cell phone downtown. She later tried to hide her role, telling detectives she had only let Killgore get Perez's help for the move, not go out with him. Maraglino deleted her text messages, disassembled her cell phone, and hid it in the bottom of a closet in her brother's house in Missouri. She was at the hotel when Lopez penned her confession letter and flew to Virginia while Lopez attempted suicide in the hotel room. Based on the totality of circumstances, the jury could reasonably find Maraglino was a major participant in criminal activities known to pose a grave risk of death (*Banks*, supra, 61 Cal.4th at p. 803). [Footnote 37: Maraglino relies heavily

on *Banks*, which reversed a true special circumstance finding as to the getaway driver in an armed robbery. (*Banks*, supra, 61 Cal.4th at pp. 804–811.) However, Maraglino's involvement was substantially greater than the getaway driver in *Banks*, who played no role in planning the robbery or procuring the weapons and was absent from the scene during the robbery and murder. (*Id*. at p. 805.)]

There is sufficient evidence from which the jury could find Maraglino acted with reckless indifference to human life under either a subjective or objective standard. The jury could reasonably find Maraglino knowingly created a grave risk of death, beyond the risk posed in aiding any kidnapping. This was no ordinary kidnapping; it was a BDSM-related kidnapping to fulfill shared sexual fantasies. Maraglino and Perez fantasized about kidnapping a person without consent and beating, raping, and killing her. She had a video in her possession showing Perez continuing in extreme BDSM activity with a woman past the point of consciousness. Her fantasy writings involved abduction, torture, and murder. Maraglino signed a release of liability form indicating her awareness that BDSM activities with Perez could result in "loss of life." She also authored a document on the day of Killgore's murder releasing her anger to Perez and entrusting justice in his hands.

Likewise, under an objective standard, the jury could find that a reasonable person in Maraglino's situation would have recognized the risk her actions posed to Killgore's life. Maraglino knew Perez's sexual interests and the risks of engaging in BDSM with him, and the jury could infer she was home during Killgore's prolonged restraint. (*Clark*, supra, 63 Cal.4th at pp. 618–621.) Given the fantasies they shared, the jury could infer a reasonable person would know Perez's likelihood to kill Killgore. (*Id*. at p. 621.) There is no indication Maraglino tried to minimize the risk of violence during the kidnapping. (*Id*. at pp. 621–622.) Given her dislike of Killgore and letter entrusting justice to Perez, the jury could infer a reasonable person would have recognized an elevated risk to human life beyond the risk apparent in any kidnapping. (Cf. *id*. at pp. 622–623.) [Footnote 38: In *Clark*, supra, 63 Cal.4th 522, the court found insufficient evidence the defendant was recklessly indifferent to human life under an objective standard. (*Id*. at p. 623.) Although the defendant planned and organized the crime and set it in motion, he took efforts to minimize the possibility of violence and was not on the ground for the immediate events leading up to the murder. (*Ibid*.) The court concluded there was nothing in the plan that elevated the risk to human life beyond those posed in any armed robbery.

(*Ibid.*)  Here, by contrast, the jury could properly find that a reasonable person in Maraglino's situation would have foreseen a risk to Killgore's life beyond the risk apparent in any kidnapping.]

Therefore, substantial evidence supports Maraglino's true special circumstance finding, and her LWOP sentence does not violate the Eighth Amendment.

(Lodgment No. 14 at 70–78.)

### 2. *Discussion*

The state court's denial of Maraglino's claim was neither contrary to, nor an unreasonable application of, clearly established law.  The standard on habeas review for assessing challenges to the sufficiency of evidence supporting a sentencing enhancement is the same as that for weighing the sufficiency of evidence underlying a criminal conviction.  *See Garcia v. Carey*, 395 F.3d 1099, 1102 (9th Cir. 2005); *see also Jackson*, 443 U.S. at 321.

As the appellate court noted, under California law, a defendant can be sentenced to life without the possibility of parole for first degree felony murder if a jury finds a special circumstance to be true.  Specifically, California Penal Code section 190.2(d) states:

[E]very person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true.

Cal. Penal Code § 190.2(d).  Kidnapping is one of the enumerated felonies.  Cal. Penal Code § 190.2(a)(17)(B).

/ / /

/ / /

/ / /

The jury was instructed pursuant to CALCRIM No. 700 that if it found Maraglino guilty of first degree felony murder, it must then decide if evidence proved the special circumstance allegation beyond a reasonable doubt. (Lodgment No. 3, vol. 4 at 1168.) Specifically, the court instructed jurors under CALCRIM No. 730 that in order to find the special circumstance to be true as to Maraglino, the prosecutor must prove the following:

1.  The defendant committed or attempted to commit or aided and abetted or was a member of a conspiracy to commit the crime of kidnapping;

2.  The defendant intended to commit or intended to aid and abet the perpetrator in committing or intended that one or more of the members of the conspiracy commit the crime of kidnapping;

3.  If the defendant did not personally commit or attempt to commit the crime of kidnapping, then a perpetrator, whom the defendant was aiding and abetting before or during the killing or with whom the defendant conspired, personally committed or attempted to commit the crime of kidnapping; AND

4.  The defendant or a perpetrator whom the defendant was aiding and abetting before or during the killing or with whom the defendant did an act that caused the death of another person.

(Lodgment No. 3, vol. 4 at 1173; *see also* CALCRIM No. 730.)

Furthermore, the court instructed the jury on the specific intent required to find the special circumstance to be true as to an accomplice, as follows:

If you decide that a defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstance of murder during the commission or attempted commission of a kidnapping, you must also decide whether the defendant acted either with intent to kill or with reckless indifference to human life.

In order to prove this special circumstance for a defendant who is not the actual killer but who is guilty of first degree murder as an aider and abettor or a member of a conspiracy, the People must prove either that the defendant intended to kill, or the People must prove all of the following:

1. The defendant's participation in the crime began before or during the killing;

2. The defendant was a major participant in the crime;

AND

3. When the defendant participated in the crime, he or she acted with reckless indifference to human life.

A person acts with reckless indifference to human life when he or she knowingly engages in criminal activity that he or she knows involves a grave risk of death.

The People do not have to prove that the actual killer acted with intent to kill or with reckless indifference to human life in order for the special circumstance of murder during the commission of a kidnapping to be true.

If you decide that the defendant is guilty of first degree murder, but you cannot agree whether the defendant was the actual killer, then, in order to find this special circumstance true, you must find either that the defendant acted with intent to kill or you must find that the defendant acted with reckless indifference to human life and was a major participant in the crime.

If the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that he or she acted with either the intent to kill or with reckless indifference to human life and was a major participant in the crime for the special circumstance of murder during the commission or attempted commission of a kidnapping to be true. If the People have not met this burden, you must find this special circumstance has not been proved true for that defendant.

(Lodgment No. 1, vol. 5 at 1169–70; *see also* CALCRIM No. 703.)

While the jury was specifically instructed on the definition of "reckless indifference," it was not instructed as to a precise definition for what constitutes a "major participant."   Such a term within a statute, however, need not be further defined when it expresses a concept within a jury's ordinary experience.  *United States v. Moore*, 921 F.2d 207, 210 (9th Cir. 1990); *see also Abernathy v. Terhune*, 60 Fed. Appx. 143, 145,

2003 WL 1194240 (9th Cir. 2003) ("[W]e hold here that the term "major participant" is a term within the ordinary experience of the jury.")

As the appellate court discussed, the California Supreme Court considered the scope of "major participant" requirement in *People v. Banks*, 61 Cal. 4th 788, 797–98 (2015). In *Banks*, the court reviewed the circumstances under which an accomplice who "lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty" or a sentence of life without the possibility of parole. *See id.* at 794, 804. The defendant in *Banks*, Lovie Matthews, was a getaway driver in an armed robbery committed by Banks and other co-defendants. *Id*. During the robbery and while escaping, Banks shot and killed one of the victims. *Id*. at 794–95. Matthews was found guilty of first degree felony murder as an accomplice. *Id*. at 797. The court in *Banks* reversed the jury's special circumstance true finding, concluding the evidence insufficient to support the conclusion that Matthews was a "major participant." *Id.* at 804–05. The court reasoned there was no evidence Matthews had any role in planning the robbery or procuring the weapons and he was not present during the murder. The court concluded that, "Matthews was, in short, no more than a getaway driver" and as such, he was not a "major participant." *Id.* at 805.

The *Banks* court identified a non-exhaustive list of relevant factors to be considered in determining whether an aider and abettor is a "major participant": the person's role in planning the enterprise that led to death; their role in supplying lethal weapons; their awareness of dangers posed by the nature of the crime, weapons used, or experience or conduct of other participants; their presence at the scene and position to facilitate or prevent the murder; whether their action or inaction played a role in the death; and what they did after lethal force was used. *Banks*, 61 Cal. 4th at 803.

Here, a reasonable juror could have concluded Maraglino was a major participant. When viewed in the light most favorable to the jury's verdict, evidence showed that Maraglino was integral in planning and assisting in carrying out Killgore's abduction. As discussed above, evidence suggested Perez and Maraglino came up with the plan to lure

Killgore with an invitation to a Hornblower cruise after hearing Hernandez discuss it on the afternoon of April 13, 2012. (Lodgment No. 1, vol. 13 at 2273–74, 2277, 2281–83.) Perez went to Killgore's apartment only a few hours later to ask her to join him, despite not having tickets as he claimed. (*Id.*, vol. 12 at 2057.) A reasonable juror could infer that Maraglino was critically involved in this, as well. Perez had never been to Killgore's apartment before and told Killgore he had "asked around" to find out where she lived, suggesting Maraglino could have helped provide the information to him. (*Id.*, vol. 12 at 2055, 2058.) When Killgore declined Perez's invitation, Perez texted Maraglino that he was "not successful." (*Id.*, vol. 15 at 2642–43; vol. 18 at 3267.) Killgore only changed her mind after Maraglino called Killgore and encouraged her to go with Perez. (*Id.*, vol. 12 at 2068, 2073; vol. 17 at 3156–57; vol. 18 at 3275–76, 3347.) Thus, Maraglino's involvement was essential to executing the plan.

Furthermore, evidence showed that minutes after Killgore sent the "help" text to Tal, Perez then texted Maraglino and returned to Maraglino's house with Killgore. (*Id.* vol. 13 at 2175–77, 2183; vol. 18 at 3283.) Perez texted Maraglino again, telling her to "come home." (*Id.*, vol. 18 at 3285.) A reasonable juror could have inferred that Killgore was killed after Maraglino (and Lopez) returned to the house.

In addition, there was extensive evidence, as discussed above, that Maraglino was directly involved in covering up the crime. She lied repeatedly to Killgore's friends and law enforcement. (*See id.*, vol. 13 at 2297–98, 2301; vol. 18 at 3286; vol. 19 at 3512–16; *see also* Lodgment No. 3, vol. 5 at 1253, 1257, 1260.) She also helped Perez create trail of false evidence. As Perez drove to downtown San Diego with Killgore's cell phone, he and Maraglino exchanged texts to make it appear she was spending a quiet night at home, watching movies. (Lodgment No. 1, vol. 18 at 3287–88.) She later attempted to destroy evidence of her cell phone communications with Killgore by wiping data from her phone and hiding it in her brother's closet in another state. (*Id.*, vol. 17 at 3179–84; vol. 19 at 3529–30, 3536; vol. 21 at 3710.) Given all the evidence, when viewed in the most

/ / /

favorable light, the state court reasonably concluded there was sufficient evidence to establish Maraglino was a "major participant."

There was also sufficient evidence Maraglino acted with reckless indifference to human life. Evidence suggested Killgore was kidnapped as part of a BDSM fantasy. Maraglino had repeatedly expressed interest in violent abductions, including "kidnapping a girl off the street, taking her somewhere, playing with her, beating her, and raping her." (*Id.* at 1346–47; vol. 9 at 1415; vol. 11 at 1858, 1884.) Given their relationship, Maraglino also knew Perez had an extensive history of choking and beating women (among other things) during BDSM activities. (*Id.* vol. 8 at 1342–43; vol. 9 at 1418, 1429; vol. 11 at 1925–28, 1931; vol. 12 at 1960–61, 1996.) In addition, Maraglino knew Killgore was not interested in BDSM and would not consent to participating. (*See id.*, vol. 13 at 2246.) In short, Maraglino knew, or should have known, that kidnapping Killgore with Perez as part of a nonconsensual BDSM abduction fantasy involved a grave risk of death. *See Clark*, 63 Cal. 4th at 621 (noting a defendant's knowledge of a cohort's propensity for violence creating a grave risk of death is relevant in determining reckless indifference).

Thus, the state appellate court reasonably concluded sufficient evidence supported the jury's special circumstance true finding. As such, the denial of Maraglino's due process claim was neither contrary to, nor an unreasonable application of, clearly established law *Jackson*. *See Williams*, 529 U.S. at 412–13; 28 U.S.C. §2254(d)(1). Nor was it based on an unreasonable determination of the facts in light of the state court record. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003); 28 U.S.C. § 2254(d)(2).

Finally, as for the Eighth Amendment aspect of Petitioner's claim, the Supreme Court has held that the Eighth Amendment prohibits "sentences that are disproportionate to the crime committed." *Solem v. Helm*, 463 U.S. 277, 284 (1983). The Supreme Court has found that imposition of the death penalty on a defendant convicted of felony murder as an accomplice does not violate the Eighth Amendment where the defendant was a major participant in the underlying felony and acted with reckless indifference to human

life. *Tison v. Arizona*, 481 U.S. 137, 152, 157–58 (1987). Furthermore, the Court has never held that a sentence of life without the possibility of parole for felony murder conviction violates the Eighth Amendment's proscription against disproportionate sentences. *See Harmelin v. Michigan*, 501 U.S. 957, 1004 (1991) ((Kennedy, J., concurring) (stating that "no sentence of imprisonment would be disproportionate" for the crime of felony murder, even though, like aiding and abetting murder, felony murder does not require the specific intent to kill) (quoting *Solem*, 463 U.S. at 290 n. 15)). Thus, Maraglino's sentence to life without the possibility of parole for felony murder is not disproportionate. *See Harmelin*, 501 U.S. at 1004. The appellate court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established law. *See Williams*, 529 U.S. at 407–08; *see also* 28 U.S.C. § 2254(d). Therefore, claim two is **DENIED** in its entirety.

## VI.    REQUEST FOR APPOINTMENT OF COUNSEL

In her Petition, Maraglino asks this Court to appoint counsel. (*See* Pet. at 17–18.) The Sixth Amendment right to counsel does not extend to federal habeas corpus actions by state prisoners. *McCleskey v. Zant*, 499 U.S. 467, 495 (1991); *Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986); *Knaubert v. Goldsmith*, 791 F.2d 722, 728 (9th Cir. 1986). However, financially eligible habeas petitioners seeking relief pursuant to 28 U.S.C. § 2254 may obtain representation whenever the court "determines that the interests of justice so require.'" 18 U.S.C. § 3006A(a)(2)(B) (West Supp. 2007); *Terrovona v. Kincheloe*, 912 F.2d 1176, 1181 (9th Cir. 1990); *Bashor v. Risley*, 730 F.2d 1228, 1234 (9th Cir. 1984).

The appointment of counsel is discretionary when no evidentiary hearing is necessary. *Terrovona*, 912 F.2d at 1177; *Knaubert*, 791 F.2d at 728. In the Ninth Circuit, "[i]ndigent state prisoners applying for habeas relief are not entitled to appointed counsel unless the circumstances of a particular case indicate that appointed counsel is necessary to prevent due process violations." *Chaney*, 801 F.2d at 1196; *Knaubert*, 791 F.2d at 728–29. Factors to be considered are the likelihood of success on the merits and

whether the issues involved are too complex for the petitioner. *Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983). In addition, the appointment of counsel may be necessary if the petitioner has such limited education that he or she is incapable of presenting his or her claims. *La Mere v. Risley*, 877 F.2d 622, 626 (9th Cir. 1987).

The issues in the present case are not too complex for Maraglino. She has sufficiently represented herself to date. The claims she raised in the Petition were also raised and fully briefed by her appellate counsel on direct appeal. Further, from the face of the petition, filed pro se, it appears that Petitioner has a sufficient grasp of the issues. The Petition was pleaded sufficiently to warrant this Court's order directing Respondent to file an answer or other responsive pleading to the Petition. As the court in *Knaubert* noted: "unless an evidentiary hearing is held, an attorney's skill in developing and presenting new evidence is largely superfluous; the district court is entitled to rely on the state court record alone." *Knaubert*, 791 F.2d at 729 (citing *Sumner v. Mata*, 449 U.S. 539, 545–57 (1981), and 28 U.S.C. §2254(d)). Moreover, as noted above, "[t]he procedures employed by the federal courts are highly protective of a pro se petitioner's rights. The district court is required to construe a pro se petition more liberally than it would construe a petition drafted by counsel." *Knaubert*, 791 F.2d at 729 (citing *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (holding pro se complaint to less stringent standard) (per curiam)); *Bashor*, 730 F.2d at 1234. For the above reasons, the "interests of justice" in this matter do not compel the appointment of counsel. *See LaMere*, 827 F.2d at 626. Accordingly, Petitioner's request for appointment of counsel is **DENIED**.

## VII. CERTIFICATE OF APPEALABILITY

Under AEDPA, a state prisoner seeking to appeal a district court's denial of a habeas petition must obtain a certificate of appealability. 28 U.S.C. § 2253(c)(1)(A). The district court may issue a certificate of appealability if the petitioner has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To satisfy this standard, a petitioner must show that "reasonable jurists would find the

/ / /

district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny a certificate of appealability. *See* Rules Governing § 2254 Cases, Rule 11(a). The Ninth Circuit has noted that the standard for granting a certificate of appealability is "relatively low." *Jennings v. Woodford*, 290 F.3d 1006, 1010 (9th Cir. 2002). A petitioner "need not show that he should prevail on the merits," *Lambright v. Stewart*, 220 F.3d 1022, 1025 (9th Cir. 2000), but may be entitled to a certificate when the "questions are adequate to deserve encouragement to proceed further." *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983) (superseded on other grounds by 28 U.S.C. § 2253(c)(2)). Here, Maraglino has failed to make "a substantial showing of the denial of a constitutional right," and reasonable jurists would not find debatable this Court's assessment of her claims. *See Slack*, 529 U.S. at 484. Accordingly, a certificate of appealability **DENIED**.

## VII. CONCLUSION

Based on the foregoing, the Court **DENIES** the petition for writ of habeas corpus; **DENIES** the request for appointment of counsel and **DENIES** a certificate of appealability.

**IT IS SO ORDERED.**

DATED: December 11, 2019

_____
Larry Alan Burns
United States District Judge

19cv0109 LAB (KSC)